Elizabeth **PICHLER**, et al.

v.

**UNITE (Union of Needletrades, Industrial & Textile Employees AFL–CIO), et al.**

Civ.A. No. 04–2841.

United States District Court, E.D. Pennsylvania.

May 31, 2005.

Beth Lincow Cole, James Bucci, Paul R. Rosen, Bruce Bellingham, David B. Picker, Spector Gadon & Rosen PC, Philadelphia, PA, for Plaintiff.

Deborah Brown, Pro Se.

Dennis Torreggiani, Susan M. Jennik, Thomas M. Kennedy, Kennedy Schwartz & Cure PC, New York City, Laurence M. Goodman, Mark Featherman, Willig, Williams & Davidson, Thomas Herman Kohn, Markowitz & Richman, Philadelphia, PA, Jeffrey P. Becherer, Joseph E. Kolick, Dickstein, Shapiro, Morin & Oshinsky, LLP, Neil I. Ditchek, Washington, DC, Robert C. Welsh, O'Melveny & Myers LLP, Los Angeles, CA, for Defendant.

## MEMORANDUM

DALZELL, District Judge.

In 2003 and 2004, two labor unions allegedly obtained scores of license plate numbers from cars in the parking lots of a company whose employees they were attempting to organize. Claiming that the unions violated their federally protected privacy rights when they used the license plate numbers to get their names and addresses, the named plaintiffs filed this lawsuit, and their motion for class certification is now before us.

*Factual Background*

A. *The Cintas Campaign*

Cintas Corporation designs and manufactures corporate uniforms and provides entrance mats, restroom supplies, promotional products, and first aid and safety products for more than 500,000 businesses. Throughout the United States and Canada, Cintas operates 351 facilities that employ more than 28,000 people. *See* http://www.cintas.com/company/corporate_profile/default.asp (last visited May 29, 2005) (on file with the undersigned); *see also* Hart Dep. at 7–8.

Since the fall of 2002, the Union of Needletrades, Industrial & Textile Employees AFL–CIO ("UNITE")[1] has been engaged in a campaign to educate Cintas employees about how to protect their rights under federal and state law (the "Cintas campaign"). In particular, UNITE was concerned with what it characterizes as Cintas's low wages,

---

1. In July of 2004, UNITE merged with the Hotel Employees and Restaurant Employees International Union ("HERE"), and the combined entity has been known as "UNITE HERE" since then. Mestrich Dep. at 10–11. For the sake of simplicity, we shall refer to the entity that is a defendant in this case as "UNITE."

poor benefits, unsafe working conditions, discriminatory practices, and violations of the Fair Labor Standards Act ("FLSA"),[2] Family Medical Leave Act ("FMLA"),[3] and workers' compensation laws. DeMay Dep. at 39–40; *see also* Mestrich Dep. at 132–36. The UNITE organizers believe that employees can best protect their rights by joining a union, DeMay Dep. at 33; Mestrich Dep. at 138–39, and they hoped to unionize 17,000 of Cintas's American employees, Raynor Dep. at 126; Mestrich Dep. at 42–43. Because organizers believed that Cintas's practices were holding down labor standards throughout the laundry industry (one of UNITE's key industries), it was critically important to them that the Cintas campaign succeed. Raynor Dep. at 49–50, 52.

Throughout the campaign, Bruce Raynor has served as UNITE's president. Raynor Dep. at 13. Keith Mestrich has been UNITE's director of strategic affairs since December of 2002, and in that capacity Mestrich has managed many of UNITE's organizing campaigns, including the Cintas campaign. Mestrich Dep. at 9–14; Raynor Dep. at 38. While Raynor and Mestrich focused on union-wide issues, of which the Cintas campaign was one of many, the ground organizing director had primary responsibility for coordinating local efforts on the national Cintas campaign. Jen Roitman was UNITE's ground organizing director on the Cintas campaign from its inception until Liz Gres replaced her in late 2003 or early 2004. DeMay Dep. at 33–34; Mestrich Dep. at 24, 194–196; Raynor Dep. at 70, 139, 189.

The Cintas campaign focused on seven metropolitan areas: New York City, Philadelphia, Detroit, Chicago, Las Vegas, Northern California, and Toronto. Mestrich Dep. at 38; *see also* Qadeer Aff. ¶ 7. In each of these metropolitan areas, a site coordinator directed UNITE's day-to-date organizing activities. For example, Megan Chambers was the New York site coordinator, Mike Scimone coordinated UNITE's efforts in and around Philadelphia, and Peter DeMay oversaw the Cintas campaign in Chicago. *See*

Raynor Dep. at 144–45; DeMay Dep. at 33–35.

By the spring of 2003, UNITE had invested more than one million dollars in the Cintas campaign. Raynor Dep. at 131. UNITE spent some of those funds supporting *Veliz v. Cintas Corp.,* No. 03–1140 (N.D.Cal.). Raynor Dep. at 73–74; Mestrich Dep. at 175. Filed on March 19, 2003, *Veliz* was a class action lawsuit alleging that Cintas violated the FLSA by not paying its drivers overtime. Qadeer Aff. ¶ 18; *see also* Raynor Dep. at 84, 87.[4] Around the same time, Cintas hired Burson Marsteller, a public relations firm, to combat the negative publicity that it was receiving from UNITE's organizing campaign. *See* Gates Dep. at 4, 8, 12.

## B. *Teamsters Join Campaign*

When UNITE organizers contacted Cintas employees, many drivers expressed a preference to speak with the International Brotherhood of Teamsters AFL–CIO (the "Teamsters"). Mestrich Dep. at 18–19. Although UNITE already represented production workers at some Cintas facilities and would have been willing to organize all of Cintas's workers, including the drivers, the UNITE organizers recognized that the Teamsters already represented some Cintas drivers. Mestrich Dep. at 189–90; Raynor Dep. at 75–76, 79. Thus, Mestrich contacted Jeff Farmer, the Teamsters' director of organizing, in the spring of 2003 to explore the possibility of the two unions collaborating. Mestrich Dep. at 17–18.

Ultimately, on May 6, 2003, UNITE and the Teamsters agreed to "combine[ ] resources ... in a coordinated fashion to win union representation and good collective bargaining agreements for Cintas employees." Rosen Decl. Ex. 7, ¶ 1. Under the terms of their agreement, UNITE obtained "exclusive jurisdiction" to organize "inside production and warehouse employees" while the Teamsters concentrated on "drivers, drivers' helpers, loaders at depots and vehi-

---

2. 29 U.S.C. §§ 201–219 (2005).

3. 29 U.S.C. §§ 2601–2654 (2005).

4. As of March 22, 2005, more than 2,400 individuals had opted in to the *Veliz* class. Qadeer Aff. ¶ 18.

cle mechanics." Rosen Decl. Ex. 7, ¶ 3(A). A Coordinating Committee, composed of three members from each union, controlled the direction of the joint campaign, but the Campaign Director, whom UNITE selected, controlled the campaign's day-to-day operations.[5] Rosen Decl. Ex. 7, ¶ 4. UNITE agreed to pay sixty percent of the campaign's costs, and the Teamsters agreed to pay the remaining forty percent of the costs. Rosen Decl. Ex. 7, ¶ 5.

### C. *Importance of Home Visits*

As part of the campaign, UNITE contacted Cintas employees to further investigate concerns of which it had already learned, to identify other allegedly problematic working conditions at Cintas, and to gauge the employees' interest in unionizing. *See* Mestrich Dep. at 199. UNITE also hoped to find additional employees willing to join either the *Veliz* class or another class action lawsuit pending against Cintas.[6] DeMay Dep. at 51, 89.

Though organizers needed to make contact, they believed that Cintas employees would not speak with them on Cintas's premises because they feared that Cintas management would retaliate against employees who consorted with the union. To put them more at ease, UNITE's organizers decided to visit employees at their homes. Qadeer Aff. ¶ 9. Before they could make any home visits, however, organizers needed to compile a list of employees' names and addresses.

### D. *UNITE Contacts Employees from Emmaus Plant*

UNITE got names and addresses of Cintas employees from a variety of sources, including telephone directories, public records, internet databases, and other employees. Mestrich Dep. at 29–31. Most significantly for purposes of this case, UNITE also obtained some employees' names and addresses from motor vehicle records, a practice that it had employed occasionally at least since the 1970s.[7] Mestrich Dep. at 199–200; Raynor Dep. at 19. In the Cintas campaign, the site coordinators for each of the seven targeted metropolitan areas exercised discretion on whether to use motor vehicle records to help build their contact lists, so there was no uniform UNITE practice throughout the nation. Raynor Dep. at 31–32; Mestrich Dep. at 45–46, 101–02; DeMay Dep. at 61.

The named plaintiffs in this case are all connected in some way to Cintas's plant in Emmaus, Pennsylvania, and Mike Scimone was the site coordinator responsible for UNITE's campaign there. Mestrich Dep. at 91, 128–29. At that plant, UNITE organizers recorded the license plate numbers of the vehicles parked in the lot. Mestrich Dep. at 48. Nick Atkins collected the lists of plate numbers and then provided a master list to Mike Scimone.[8] *See* Mestrich Dep. at 52. Scimone, in turn, forwarded the license plate numbers to Peter DeMay, the Chicago site coordinator. DeMay Dep. at 74–75.

DeMay had the ability to obtain the names and addresses of the individuals to whom particular license plates were registered. For some states' license plates, DeMay could obtain registrants' names and addresses by searching Westlaw. Mestrich Dep. at 53; DeMay Dep. at 32–33, 42–45.[9] Westlaw,

---

5. Mestrich, Gres, and Ahmer Qadeer represented UNITE on the Coordinating Committee, and the Teamsters selected Farmer and two others as their representatives. Raynor Dep. at 139.

6. The second suit, *Ramirez v. Cintas Corp.*, No. 04–281 (N.D.Cal.), alleges that Cintas discriminates against its employees based on race, national origin, and sex. *Rameriz* was filed in January of 2004. Qadeer Aff. ¶ 13.

7. The practice persisted in spite of the fact that it was relatively inaccurate and expensive. Mestrich Dep. at 45–46; DeMay Dep. at 49–50; Raynor Dep. at 60–61.

8. To maximize the likelihood that they were recording employees' license plates—and not the plates of one-time visitors—Atkins verified that organizers had recorded each license plate number twice before he added it to the master list that he provided to Scimone. *See* Mestrich Dep. at 77.

9. Westlaw requires users to state the purpose for which they are searching motor vehicle records by checking one of a limited number of boxes. When he used Westlaw to search for Cintas employees' names and addresses, DeMay checked the box for "skip tracing" or the box for "litigation" at "random." DeMay Dep. at 102–05.

however, did not include motor vehicle registration information for other states, including Pennsylvania. When DeMay could not retrieve the necessary information from Westlaw, he asked John Rea, a private investigator, to get it.[10] Mestrich Dep. at 54–57.

DeMay contacted Rea soon after Scimone asked for help obtaining names and addresses from Pennsylvania license plate numbers. DeMay Dep. at 74–75. On or around December 5, 2003 and January 20, 2004, Scimone sent lists of license plate numbers to DeMay, and DeMay e-mailed the lists to Rea. DeMay Dep. at 82–83; Rea Dep. at 55–60. Rea then faxed the lists to Infotrack. *Id.; see also* Rea Dep. Ex. 1, at 523–24; Rea Dep. Ex. 5; Rea Dep. Ex. 1, at 525–26; Rea Dep. Ex. 6.[11] Infotrack passed the lists on to American Investigation Resource ("AIR"), a Pennsylvania private investigator agency, and AIR submitted separate "service requests" to Pennsylvania Auto License Brokers ("PALB") for each of the license plate numbers on the lists. *See, e.g.,* Naccarato Dep. Ex. 4, at 137.

PALB has direct access to the Pennsylvania Department of Transportation's ("PennDOT"'s) computerized database of motor vehicle information. Using the license plate numbers, PALB searched the PennDOT database and obtained vehicle record abstracts for each of AIR's service requests. *See* Naccarato Dep. at 14–16. A vehicle record abstract includes, among other things, the name and address of the vehicle's registered owner. *See, e.g.,* Naccarato Dep. Ex. 4, at 138. After PALB printed the abstracts, they made their way back to AIR, Infotrack, Rea, DeMay, and finally Scimone.

With the abstracts in hand, Scimone was able to create a spreadsheet of Cintas employees at the Emmaus plant. *See* Rosen Decl. Ex. 26 [12]; Mestrich Dep. at 33. Since the spreadsheet included names and addresses, it enabled organizers to visit Cintas employees at their homes to discuss the campaign. Over the weekend of February 7, 2004, the UNITE organizers actually visited many Cintas employees' homes. For example, they went to the residences of Elizabeth Pichler,[13] Kathleen Kelly,[14] Seth Nye,[15] Rus-

10. For example, Rea investigated some Illinois license plates when DeMay needed more up-to-date information than was available through Westlaw. *See* DeMay Dep. at 45–46, 62–63. Rea obtained the information from Infotrack, an information broker. Rea Dep. at 19–20, 26; *see also* Rea Dep. Ex. 4.

When Megan Chambers, the New York site coordinator, needed help finding the names and addresses associated with license plates that her staff had recorded, she contacted DeMay, and DeMay put her in touch with Rea. DeMay Dep. at 54, 60. Rea obtained the information with the assistance of another private investigator, Robert Carroll. Rea Dep. at 26, 30; *see also* Rea Dep. Exs. 2–3.

Apart from the Pennsylvania, Illinois, and New York records about which DeMay and Rea testified, UNITE also admits to accessing records from Michigan, Nevada, Indiana, California, Ohio, and Connecticut. Rosen Decl. Ex. 2, at 5.

DeMay and other UNITE employees also asked Rea whether he could get motor vehicle information from Connecticut, New Jersey, and California. Rea was unable to obtain information from those states. Rea Dep. at 16–18, 45, 53–54; *see also* Rea Dep. Ex. 1, at 519.

11. Although the cited documents are evidence of the two requests described in the text, Infotrak's invoices to Rea suggest that there may have been other requests for Pennsylvania motor vehicle records made on or around November 14, 2003, November 21, 2003, November 25, 2003, and

December 2, 2003. *See* Rea Dep. at 93–104; *see also* Rea Dep. Ex. 8.

12. If there is a license plate number listed in the "Notes1" column of the spreadsheet for a particular employee, then UNITE obtained that employee's name and address through the intricate process described in the text. *See* Mestrich Dep. at 37.

13. *See* Pichler Dep. at 43–45; *see also* Pls.' Deps. Ex. 11, at 462. Pichler is a receptionist at Cintas who drives her own car to work. Pichler Dep. at 7, 42; *see also* Naccarato Dep. Ex. 2, at 21; Rea Dep. Ex. 1, at 531.

14. Although Kelly works in Cintas's stockroom, she drives a car that her boyfriend and housemate, Russell Christian, owns. Kelly Dep. at 5–6, 38; Christian Dep. at 34; *see also* Naccarato Dep. Ex. 2, at 13; Rea Dep. Ex. 1, at 532. When the organizer came to their home, he asked to speak to Christian. Kelly Dep. at 12–16; Christian Dep. at 35–41; *see also* Pls.' Deps. Ex. 11, at 463.

15. In February of 2004, Nye was a Cintas management trainee who jointly owned his car with his mother, Holly Marston. The address listed on the vehicle's registration was Marston's home address. Nye Dep. at 33; Marston Dep. at 10–12; *see also* Naccarato Dep. Ex. 2, at 23; Rea Dep. Ex. 1, at 528. When a UNITE organizer

sell Daubert,[16] and Kevin Quinn.[17]

### E. Teamsters Contact Employees from Emmaus Plant

While UNITE attempted to reach Cintas's production workers, the Teamsters concentrated solely on organizing drivers. By early 2004, when the campaign at the Emmaus plant was in full swing, the *Veliz* litigation had been pending for nine months, and Cintas had produced two lists of its drivers' names in connection with that litigation. *See* Pls.' Deps. Ex. 1. Both of these lists were organized by plant, and Iain Gold, an employee in the Teamsters' organizing department, was able to use them to create a single list of all drivers at the Emmaus plant. *See* Kane Dep. at 32–33, 77; *compare* Pls.' Deps. Ex. 1–A, at 55; Pls.' Deps. Ex. 1–B, at 160–61 *with* Pls.' Deps. Ex. 4, at 227–28. After he created the list of Emmaus drivers, Gold e-mailed it to James Kane, the Teamsters' lead ground coordinator, who was working in Pennsylvania in early 2004.[18] *See* Pls.' Deps. Ex. 4, at 222; Kane Dep. at 41–42, 133.

Gold's list only included drivers' names, and Kane found their addresses by checking union cards that the Teamsters had kept on file since 1998 and by using internet search engines. Kane Dep. at 77–82; *see* Pls.' Deps. Exs. 2, 3; Pls.' Deps. Ex. 4, at 221.[19]

On February 8, 2004, while the UNITE organizers were attempting to visit Cintas employees, Kane and Brad Yeakel also made house calls to the drivers on the list that they received from Gold. Kane Dep. at 43, 151–52, 205. That afternoon, they went to Thomas Riley's home and asked his wife, Amy, if they could speak with him.[20] A. Riley Dep. at 10–11. As soon as Thomas Riley realized that the visitors were union organizers, he asked them to leave, and they complied with his request. T. Riley Dep. at 47–50; *see also* Pls.' Deps. Ex. 5. Riley then called Jose Luis Sabastro, another driver,[21] to find out if the Teamsters had contacted him yet. *Id.* at 27–28. Although they had not yet arrived, Kane and Yeakel soon contacted Sabastro at his residence.[22] J. Sabastro Dep. at 24–26, 39,

came Marston's home asking to speak to Nye, she explained that Nye was a management trainee, so the organizer left the residence. Nye Dep. at 11–12, 25; Marston Dep. at 13–15; *see also* Pls.' Deps. Ex. 11, at 468–69.

16. Daubert is a service training coordinator at Cintas. R. Daubert Dep. at 6–7. Service training coordinators are responsible for training Cintas's service sales representatives ("SSRs" or "drivers") and for assisting service managers. At its Emmaus plant, Cintas employs approximately forty SSRs, four service training coordinators, and four service managers. *Id.* at 7–11. The service managers are responsible for maintaining good relationships with Cintas's customers, and they all report to the plant's general manager, Steve Gettins. Quinn Dep. at 7–8.

Daubert denies ever receiving a visit from UNITE organizers, but UNITE's records reflect an attempt to visit him. *Compare* R. Daubert Dep. at 14–15 *with* Pls.' Deps. Ex. 11, at 465. Although Daubert claims that the car that he drove to work was registered jointly in his and his wife's names, the vehicle record abstract lists only him as an owner. *Compare* R. Daubert Dep. at 14; C. Daubert Dep. at 25–26 *with* Rea Dep. Ex. 1, at 527; Naccarato Dep. Ex. 4, at 126.

17. Quinn, a service manager who is the sole owner of the car that he drives to work, received a visit from two female UNITE organizers. Quinn Dep. at 7, 54; *see also* Pls.' Deps. Ex. 11, at 466; Naccarato Dep. Ex. 2, at 15; Rea Dep. Ex. 1, at 529. Although the Teamsters maintain a house-call form indicating that James Kane also visited

Quinn, *see* Pls.' Deps. Ex. 5, Quinn does not recall a man visiting his home, and Kane stated that he received the information on the sheet from the UNITE organizers, Kane Dep. at 148–151.

18. Although Cintas has multiple plants in Pennsylvania, the Teamsters only attempted to organize drivers at the Emmaus plant. Kane Dep. at 43, 98–99.

19. Around September of 2004, the Teamsters obtained additional addresses from an outside company (perhaps Lexis) for use in a mailing, but that company did not access motor vehicle records. Kane Dep. at 83–84, 126, 190; *see also* Qadeer Aff. Ex. BB.

20. Thomas and Amy Riley are the joint owners of the car that Thomas drives to the Cintas plant. T. Riley Dep. at 51–52; A. Riley Dep. at 27–28; *see also* Naccarato Dep. Ex. 2, at 19. Their telephone number is unlisted. T. Riley Dep. at 31; A. Riley Dep. at 12.

21. Although Riley and Sabastro were both drivers in February of 2004, they have since been promoted to service training coordinators. *See* T. Riley Dep. at 5; J. Sabastro Dep. at 5–6.

22. Sabastro is the sole owner of the car that he drives to work. D. Sabastro Dep. at 15–16; *see also* Naccarato Dep. Ex. 2, at 17; Rea Dep. Ex. 1, at 530. His telephone number is unlisted. *See* D. Sabastro Dep. at 14.

45; D. Sabastro at 16–18; *see also* Pls.' Deps. Ex. 5. After these visits, the Teamsters shared the information that they collected with UNITE. Kane Dep. at 157–58, 161, 207–08; *see also* Pls.' Deps. Exs. 7, 8.

### F. *This Litigation*

On Monday, February 9, 2004, Pichler, Quinn, Thomas Riley, and Jose Sabastro asked Amy Baker, Cintas's human resources representative at the Emmaus plant, how the unions could have obtained their home addresses.[23] *See* Pichler Dep. at 19–20; Quinn Dep. at 22; T. Riley Dep. at 10, 33–35; J. Sabastro Dep. at 23–24; *see also* Hart Dep. at 46–48. Though Baker could not provide an explanation at that time, she later contacted the employees to inform them that, if they were interested, they would have the opportunity to meet with a lawyer at the Emmaus plant. *See* Pichler Dep. at 19–21; T. Riley Dep. at 35; J. Sabastro Dep. at 29–30; Kelly Dep. at 10–11, 20; Nye Dep. at 12.[24] When he learned of the employee complaints, Jeffrey I. Kohn, Esq., of O'Melveny & Myers, Cintas's outside counsel, contacted Paul R. Rosen, Esq., of Spector Gadon & Rosen, P.C. ("Spector Gadon") to inquire whether he had any interest in representing the employees. Rosen Decl. ¶¶ 3–4.

One afternoon in April of 2004, Pichler, Deborah Brown, Kelly, Nye, Quinn, Russell Daubert, Thomas Riley, and Jose Sabastro (collectively, the "employee plaintiffs") met with Kohn and James Bucci, Esq., of Spector Gadon. Kohn introduced himself and asked the employees to describe their encounters with the union organizers. When they had finished, Kohn introduced Bucci and then left the conference room. In all, the meeting lasted about one hour. Hart Dep. at 85–87; Pichler Dep. at 21–23; Kelly Dep. at 8–9, 20–

21; Nye Dep. at 10; Quinn Dep. at 26, 31, 35; R. Daubert Dep. at 37; T. Riley Dep. at 42–44; J. Sabastro Dep. at 31–37. Soon after the meeting, Bucci contacted Christian, Marston, Carri Daubert, Amy Riley, and Deborah Sabastro (collectively, the "non-employee plaintiffs" and, together with the employee plaintiffs, the "plaintiffs") by telephone. Christian Dep. at 10–12, 16–17; Marston Dep. at 22; A. Riley Dep. at 19–20; D. Sabastro Dep. at 26.[25]

Eventually, each of the plaintiffs retained Spector Gadon to represent him or her in a lawsuit against UNITE and the Teamsters. *See* Kennedy Decl. Ex. U. Spector Gadon's contingent fee agreements provided that "none of the individual plaintiffs [would] be exposed to any legal fees or costs throughout the prosecution of the case" because Cintas agreed to "advance [Spector Gadon's] fees and costs at [its] normal billing rates."[26] Rosen Decl. Ex. 12, at 1. If the plaintiffs prevail, then Spector Gadon will "reimburse Cintas ... solely from the attorneys' fees and costs [that it] receive[s] from the plaintiffs, up to the amount Cintas ... advance[d]." *Id.* In spite of this financing relationship, Cintas agreed to "respect[ ] and ... not interfere with [Spector Gadon's] attorney-client relationship with the plaintiffs or the independence of [its] professional judgment, particularly with regard to the handling of [the litigation] in the best interests of the plaintiffs." *Id.,* at 2. Spector Gadon promised to "consult with Cintas on a periodic basis to discuss the costs associated with anticipated legal actions." *Id.* Aside from this case, Cintas and Spector Gadon have had no business dealings. Hart Dep. at 69.

On June 28, 2004, Spector Gadon initiated this lawsuit by filing a complaint on behalf of the plaintiffs.[27] A few weeks later, the plain-

---

**23.** Kelly and Nye raised similar concerns with their supervisors. *See* Kelly Dep. at 15–16; Nye Dep. at 15.

**24.** Thomas Riley—not Baker—informed Russell Daubert of the lawyers' visit. R. Daubert Dep. at 37. Quinn does not recall how he learned of the meeting. Quinn Dep. at 32.

**25.** Carri Daubert did not report discussing the union organizers' visit to Bucci, but she did retain Bucci to represent her. *See* C. Daubert Dep. at 18.

**26.** Cintas claims to have advanced Spector Gadon's fees and costs because it wanted to provide its employees with a way to protect their privacy. Hart Dep. at 75–76.

**27.** Although Cintas maintains that it did not review the complaint before it was filed, *see* Hart Dep. at 84, its public relations agent, Wade Gates of Burson Marsteller, did review the complaint and discussed it with at least one Cintas employee, *see* Hart Dep. at 34, 177. Gates drafted a

# 240

tiffs filed a one-count amended class action complaint alleging that UNITE, Raynor, and the Teamsters violated the Driver's Privacy Protection Act of 1994 ("DPPA" or the "Act").[28] To remedy these violations, plaintiffs each requested that we award liquidated damages of $2,500, punitive damages, attorneys' fees, costs, and injunctive relief. *See* Am. Compl. at 14. The defendants moved to dismiss the amended complaint, but we denied their motions. *See Pichler v. UNITE,* 339 F.Supp.2d 665 (E.D.Pa.2004). Until it received notice of this suit, UNITE was not aware of the DPPA, but it has since stopped using license plate numbers in connection with its organizing efforts at Cintas and elsewhere. Raynor Dep. at 25; Mestrich Dep. at 116–17.

While the parties were engaged in class action discovery, Cintas and the plaintiffs entered into a "common interest agreement" purporting to extend the attorney-client privilege and work product privilege to any materials that they shared with each other. *See* Rosen Decl. Ex. 13. Deborah Brown also stipulated to the dismissal without prejudice of her claims against the defendants. During this same period, more than one hundred people from twenty-three states contacted Spector Gadon to express interest in joining the class. Friedman Decl. ¶ 3; *see also* Hart Dep. at 76. Now that the parties have completed class action discovery, we must consider plaintiffs' motion for class certification.

*Analysis*

### A. DPAA

Unless one of its exceptions applies, the DPPA forbids state officials from "knowingly disclos[ing] or otherwise mak[ing] available to any person or entity personal information about any individual obtained by the department [of motor vehicles] in connection with a motor vehicle record." 18 U.S.C. § 2721(a) (2005). It also prohibits others from knowingly "obtain[ing] or disclos[ing] personal information[ ], from a motor vehicle record" for an unlawful purpose and from "mak[ing] false representation[s] to obtain any personal information from an individual's motor vehicle record." § 2722(b). Those who "knowingly obtain[ ], disclose[ ] or use[ ] personal information, from a motor vehicle record" are "liable to the individual to whom the information pertains." § 2724(a). If a defendant is found liable, the court "may" award:

(1) actual damages, but not less than liquidated damages in the amount of $2,500;

(2) punitive damages upon proof of willful or reckless disregard of the law;

(3) reasonable attorneys' fees and other litigation costs reasonably incurred; and

(4) such other preliminary and equitable relief as the court determines to be appropriate.

§ 2724(b). Since we cannot begin to address many of the issues that the motion for class certification raises without a clear understanding of the Act, we shall first consider three features of the DPPA that are of particular importance to this case.

### 1. Standing

"In every federal case, the party bringing the suit must establish standing to prosecute the action." *Elk Grove Unified School Dist. v. Newdow,* 542 U.S. 1, 124 S.Ct. 2301, 2308, 159 L.Ed.2d 98 (2004). Questions of standing involve "both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Though this case does not implicate any prudential considerations, we must address whether the Constitution would permit us to consider the claims of all of the plaintiffs. *See FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 607, 107 L.Ed.2d 603 (1990) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of the jurisdictional doctrines.") (quotations and alterations omitted).

The Supreme Court has summarized three elements that constitute the "irreducible constitutional minimum of standing" as:

---

press release that Spector Gadon issued after it filed the complaint. *See* Gates Dep. at 56–60.

**28.** 18 U.S.C. §§ 2721–2725 (2005).

First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of— the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (quotations, alterations, and citations omitted). The defendants have not suggested that any of these three elements may be lacking, so they apparently believe that all are present here. Nevertheless, we must consider whether all of the plaintiffs have suffered an "invasion of a legally protected interest."

The DPPA provides a private cause of action to "the individual to whom [unlawfully obtained, disclosed, or used] information pertains." *See* 18 U.S.C. § 2724(a) (2005). If the information does not "pertain" to an individual, then that individual may not sue under the DPPA. In other words, the only "interest" that the DPPA protects is an individual's interest in the privacy of motor vehicle records that include information about her. If a motor vehicle record does not include information about a person, then that person has no "legally protected interest" in the confidentiality of that motor vehicle record.

■ The problem for three of the plaintiffs should be apparent. Though Kathy Kelly is a Cintas employee, UNITE did not obtain any personal information about her from motor vehicle records. UNITE did obtain information about Russell Christian, her boyfriend and housemate, but Christian's vehicle record abstract does not refer to Kelly. Similarly, Carri Daubert and Deborah Sabastro were not the registered owners of the vehicles about which UNITE obtained information. While UNITE may have invaded their husbands' privacy when it obtained vehicle record abstracts for cars registered to their husbands, it could not have violated Carri Daubert and Deborah Sabastro's own DPPA-protected privacy interests because the motor vehicle abstracts contain no information about them. Even under their theory of the case, Kathy Kelly, Carri Daubert, and Deborah Sabastro suffered no invasion of an interest that the DPPA protects, so they lack standing to sue under the DPPA.

## 2. *State of Mind*

Under the DPPA, a "person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable" to the person whose personal information was accessed. 18 U.S.C. § 2724(a) (2005). From this language, the Teamsters argue that they cannot be held liable unless they (1) knowingly obtained, disclosed, or used personal information; (2) knew that the information was from motor vehicle records; and (3) knew that the purpose for which the information was obtained, disclosed, or used was impermissible. *See* Teamsters's Mem. at 10 n. 15. Plaintiffs concede that they must prove that the Teamsters knowingly obtained, disclosed, or used the information and that the Teamsters knew the information came from motor vehicle records, but plaintiffs insist that they need not prove that the Teamsters knew that it was illegal to obtain, disclose, or use the information. *See* Pls.' Reply at 7–9 & n. 8.

The structure of § 2724(a) and the location of the adverb "knowingly" within that structure suggest that Congress intended to limit the reach of the knowledge requirement. The relevant portion of § 2724(a) includes three clauses: (1) "obtains, discloses or uses personal information" (the "first clause"); (2) "from a motor vehicle record" (the "second clause"); and (3) "for a purpose not permitted" (the "third clause"). The first clause specifies the acts (obtaining, disclosure, and use of personal information) that the DPPA prohibits, and the second clause modifies the first clause by limiting the relevant kind of "personal information" to information "from a motor vehicle record." In this way, the first and second clauses work together to

establish the "act" element that a plaintiff must prove to recover under the DPPA. The third clause, on the other hand, creates an independent "purpose" element, representing the second half of a plaintiff's burden of proof on DPPA liability.

Recognizing that § 2724(a) articulates an act element and a purpose element, we must discern whether Congress intended for the word "knowingly" to reach both elements (as the Teamsters argue) or only the former (as plaintiffs contend). In this regard, we find the location of the adverb "knowingly" to be significant. Congress placed "knowingly" immediately before three verbs ("obtains, discloses or uses"), and the most natural reading of the text limits the reach of that adverb to the verbs adjacent to it. If Congress had intended for "knowingly" to refer not only to the act element but also to the purpose element—so as to proscribe only those acts done for a purpose not "knowingly" permitted—it would have been odd to locate the word "knowingly" at such a remove from the purpose element.

If one could not violate the DPPA without "knowing[ ]" that the purpose for which he "obtain[ed]," "disclose[d]" or "use[d]" motor vehicle information was unlawful, then every defendant would get at least one free bite at the violation-of-privacy apple. After all, anyone could claim that he did not "know" his purpose to be impermissible until a court interpreted the DPPA to proscribe that purpose. Even after such a ruling, a defendant could manufacture a slightly different purpose for his conduct and then claim ignorance of whether the DPPA prohibited the new purpose. A plaintiff could recover only if the defendant repeatedly violated her pri-

vacy and lacked sufficient creativity to conjure up some conceivable purpose that no court had yet considered.

 Since defendants have not provided any evidence that Congress intended such a strange result, we hold that, to be eligible to recover under the DPPA, a plaintiff must prove that (1) the defendant knowingly obtained, disclosed, or used personal information from her motor vehicle records; and (2) the purpose of such obtaining, disclosure, or use was not permissible. The plaintiff need not show that the defendant knew that the obtaining, disclosure, or use was impermissible.[29]

### 3. Available Remedies

If a plaintiff establishes that a defendant violated the DPPA, the court may award "actual damages, but not less than liquidated damages in the amount of $2,500." 18 U.S.C. § 2724(b)(1) (2005). Plaintiffs contend that this language would permit them to receive the greater of either $2,500 or their actual damages. On the other hand, defendants argue that "to recover liquidated damages, plaintiffs must first prove 'actual damages.' " Teamsters's Mem. at 9; *see also* UNITE Mem. at 26–28. Before explaining how we interpret § 2724(b)(1), we shall examine three cases on which defendants rely.

#### a. Doe v. Chao

The first case, *Doe v. Chao*, 540 U.S. 614, 124 S.Ct. 1204, 157 L.Ed.2d 1122 (2004), required the Supreme Court to construe the remedial provisions of the Privacy Act, 5 U.S.C. § 552a (2005). That statute requires the Department of Labor, among other fed-

---

**29.** We recognize some tension between our holding and *Liparota v. United States*, 471 U.S. 419, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985). In construing a statute that criminalized "knowingly us[ing], transfer[ring], acquir[ing], alter[ing], or possess[ing] [food stamp] coupons or authorization cards in any manner not authorized by [the statute] or the regulations," 7 U.S.C. § 2024(b)(1) (1977), *Liparota* held that "the Government must prove that the defendant knew that his acquisition or possession of food stamps was in a manner unauthorized by statute or regulations." *Liparota*, 471 U.S. at 433, 105 S.Ct. at 2092. Apart from the peculiarities of the food stamp statute's text and the absence of any

illuminating legislative history for that enactment (neither of which is relevant to this case), the result in *Liparota* depended heavily on the rule of lenity and the principle that "criminal offenses requiring no *mens rea* have a 'generally disfavored status.' " *See id.*, 471 U.S. at 426, 105 S.Ct. at 2088. Since § 2724(a) is not a criminal statute, however, these interpretive principles do not assist us here. Moreover, even in the criminal context, the Court has read *Liparota's* holding as strictly limited to its facts. *See Bryan v. United States*, 524 U.S. 184, 193 & n. 15, 118 S.Ct. 1939, 1946 & n. 15, 141 L.Ed.2d 197 (1998).

eral agencies, to protect personal information, including Social Security numbers. *See id.* When an agency willfully or intentionally fails to protect one's private information, the Privacy Act makes the United States liable for "actual damages sustained . . . as a result of the . . . failure, but in no case shall a person *entitled to recovery* receive less than the sum of $1,000." § 552a(g)(4)(A) (emphasis added).

In *Doe,* the Department of Labor conceded that it had violated the Privacy Act when it disclosed Doe's Social Security number to others. *See Doe,* 124 S.Ct. at 1206, 124 S.Ct. 1204. Doe sued the Department and submitted uncontroverted evidence that he was "torn . . . all to pieces" and "greatly concerned and worried" about the disclosure. *Id.* at 1207, 124 S.Ct. 1204 (quotations omitted). The district court granted summary judgment to Doe and awarded $1,000 in statutory damages, but the court of appeals read § 552a(g)(4)(A) to mean that "the $1,000 statutory minimum [was] available only to plaintiffs who suffered actual damages." *Id.* Since Doe made only "conclusory allegations" of emotional distress and "submitted no corroboration . . ., such as evidence of physical symptoms, medical treatment, loss of income, or impact on his behavior," the court of appeals reversed the district court's judgment and concluded that the United States was entitled to summary judgment. *Id.* Relying primarily on the text and legislative history of § 552a(g)(4)(A) and on the common law of torts, the Supreme Court affirmed the court of appeals.

*Doe* stands for the proposition that a plaintiff seeking relief under the Privacy Act cannot recover the $1,000 minimum award unless he proves "actual damages."[30] Though defendants attempt to extend this holding to the DPPA, two material differences between that Act and the Privacy Act deprive *Doe* of controlling weight here.

First, unlike the Privacy Act, the DPPA does *not* include the phrase "entitled to recovery," which the Supreme Court found to be "critical limiting" language. *See Doe,* 124

S.Ct. at 1212, 124 S.Ct. 1204. The Court focused on the phrase "entitled to recovery" because, if that language is to have any meaning in the Privacy Act, it must "look[ ] back to the immediately preceding provision for recovering actual damages." *Id.* at 1208, 124 S.Ct. 1204. Moreover, the Court used the common law of torts to ascribe meaning to the phrase "entitled to recovery" and criticized Doe's reading of the Privacy Act for being "at odds with the traditional understanding that tort recovery requires not only wrongful act plus causation reaching to the plaintiff, but proof of some harm for which damages can reasonably be assessed." *Id.* at 1209, 124 S.Ct. 1204. In short, the result in *Doe* turned on the phrase "entitled to recovery," language which the Supreme Court itself recognized as "critical" to the result. Since the DPPA does not use that qualifying language, *Doe* does not control this case.

A second material distinction between the DPPA and the Privacy Act buttresses this conclusion. While the DPPA describes the statutory minimum amount of damages as "liquidated damages," *see* 18 U.S.C. § 2724(b)(1), the Privacy Act states simply that "in no case shall a person entitled to recovery receive less than the sum of $1,000," 5 U.S.C. § 552a(g)(4)(A). As long recognized in the common law of contracts, liquidated damages are "the sum a party to a contract agrees to pay if he breaks some promise, and which, having been arrived at by a good faith effort to estimate in advance the actual damage that will probably ensue from the breach, is *legally recoverable as agreed* damages if the breach occurs." *In re Plywood Co.,* 425 F.2d 151, 154 (3d Cir.1970) (describing New Jersey law); *cf. Pantuso Motors, Inc. v. CoreStates Bank, N.A.,* 568 Pa. 601, 798 A.2d 1277, 1282 (2002) (approving of this definition). Because they avoid the need for judicial inquiry into the amount of damage actually sustained, liquidated damages provisions "serve a particularly useful function when damages are uncertain in nature or amount or are unmeasurable." *Priebe & Sons, Inc. v. United States,* 332 U.S. 407, 411, 68 S.Ct.

---

**30.** The Court assumed without deciding that a plaintiff could not prove "actual damages" under the Privacy Act if he made only "conclusory allegations" of emotional distress. *Doe,* 124 S.Ct. at 1207, 1212 n. 12.

123, 126, 92 L.Ed. 32 (1947). Further, "damages are recoverable under a valid liquidated damages provision even though no actual damages are proven as a consequence of that breach." *Pierce Assoc., Inc. v. Nemours Foundation,* 865 F.2d 530, 546 (3d Cir.1988) (describing Delaware law); *cf. Commonwealth, Dep't of Transp. v. Mitchell,* 517 Pa. 203, 535 A.2d 581, 587 n. 2 (1987) ("Once it has been determined that liquidated damages are recoverable under the contract, evidence of actual damage . . . is inadmissible.").

Congress's decision to use the technical term "liquidated damages" in the DPPA suggests that it intended to incorporate the locution's well-understood meaning. In other words, the reference to "liquidated damages" implies that a DPPA plaintiff should receive damages on the same terms as a plaintiff who proves breach of a contract with a reasonable liquidated damages provision. Both are entitled to liquidated damages without proof of actual damages because the stated amount of liquidated damages represents an estimate of the damages that each is likely to suffer from the violation of a legally enforceable right. *Doe,* of course, had no occasion to consider any of these issues because the Privacy Act does not refer to "liquidated damages."

The two key distinctions between the DPPA and the Privacy Act that we have identified explain why *Doe's* holding cannot control our decision in this case. Though not controlling, *Doe* may persuade, and, in that regard, we note some of its dicta that we find helpful here. In explaining its holding, the Supreme Court suggested that, if Congress had intended to permit recovery under the Privacy Act without any showing of actual damages, it "could have accomplished its object simply by providing that the Government would be liable to the individual for *actual damages 'but in no case . . . less than the sum of $1,000.'*" *Doe,* 124 S.Ct. at 1210, 124 S.Ct. 1204 (emphasis added). Since the DPPA uses almost precisely this language, *see* 18 U.S.C. § 2724(b)(1) (providing for "actual damages, but not less than liquidated

damages in the amount ·of $2,500"),[31] *Doe* suggests rather directly that plaintiffs need not prove actual damages to recover the DPPA's minimum liquidated damages award of $2,500.

### b. *Kehoe v. Fidelity Federal*

Unlike *Doe,* which construed a different statute from the one at issue here, *Kehoe v. Fidelity Fed. Bank & Trust,* No. 03–80593, 2004 WL 1659617 (S.D.Fla. June 14, 2004), required another district court to confront precisely the interpretative question that we face here. After "1) consideration of the Supreme Court's decision in *Doe v. Chao;* 2) textual analysis of the Driver's Privacy Protection Act; 3) application of the rule of the last antecedent; 4) examination of the text of other relevant privacy statutes; and 5) examination of the purpose of the phrase 'liquidated damages' in the DPPA," the *Kehoe* court held that "a plaintiff must prove some actual damages to qualify for a minimum liquidated damages award of $2,500 under the DPPA." *Kehoe,* at *8. For the reasons already stated, we find neither the Florida district court's interpretation of *Doe* nor its discussion of the phrase "liquidated damages" to be persuasive, and we cannot locate any independent "textual analysis" of the DPPA in its opinion. Having not yet discussed the rule of the last antecedent or the text of other privacy statutes, we shall consider those guides in our quest to discern congressional intent.

*Kehoe* relied heavily on the rule of the last antecedent, "according to which a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Barnhart v. Thomas,* 540 U.S. 20, 26, 124 S.Ct. 376, 380, 157 L.Ed.2d 333 (2003). Applying this canon of statutory construction to the DPPA, the Florida district court interpreted the qualifying phrase "but not less than liquidated damages in the amount of $2,500" as modifying the noun "actual damages" and therefore concluded that the qualifying phrase "would not extend out as its own remedy to be

---

**31.** The only material difference is the DPPA's reference to "liquidated damages." As we explained in the text, that phrase's common law provenance also suggests that plaintiffs need not establish actual damages to qualify for the minimum $2,500 award.

awarded regardless of actual damages." *Kehoe*, at \*6.

The Florida district court should not have applied the rule of the last antecedent to the language of the DPPA. In the past, the Supreme Court has applied that rule to texts that include a series of nouns (or phrases) where the last noun (or phrase) is then modified by a dependent clause. The question frequently arises whether the dependent clause modifies all of the nouns (or phrases) in the series or only the final noun (or phrase), and the rule of the last antecedent presumes that the clause modifies only the final noun (or phrase). *See, e.g., Barnhart* (holding that the phrase "which exists in the national economy" in 42 U.S.C. § 423(d)(2)(A) modifies only "other kind of substantial gainful work" and not "previous work"); *FTC v. Mandel Brothers, Inc.*, 359 U.S. 385, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959) (explaining that the phrase "who is engaged in dealing commercially in fur products or furs" in 15 U.S.C. § 69(f) modifies only "any other person" and not "purchaser, consignee, factor, bailee, correspondent, or agent").

■ Because § 2724(b)(1) is so different from other statutes to which the Supreme Court has applied the rule of the last antecedent, the rule seems irrelevant to interpreting whether a DPPA plaintiff must prove actual damages to qualify for liquidated damages. First, § 2724(b)(1) contains, at most, only one antecedent ("actual damages") before the qualifying phrase ("but not less than liquidated damages in the amount of $2,500"). While the rule of the last antecedent may assist a judge in deciding whether modifying language applies to one, or all, antecedents, its value is quite limited when there are not multiple antecedents.

More fundamentally, the Florida district court assumed that the clause "but not less than liquidated damages in the amount of $2,500" "qualified" the phrase "actual damages," *see Kehoe*, at \*6, but neither the text of the statute nor the rule of the last antecedent (which is by its terms simply inapplicable to § 2724(b)(1)) requires any such assumption. It is far from clear in what sense the *Kehoe* court meant that the reference to liquidated damages "qualified" the availabili-

ty of actual damages because its holding functionally "qualifies" the availability of liquidated damages on proof of actual damages. From a grammatical standpoint, there is no doubt that the dependent clause "but not less than liquidated damages in the amount of $2,500" "depends" on the independent clause "actual damages," but that grammatical principle does not require the conclusion that the former clause "qualifies" the latter in terms of functional legal effect.

*Kehoe* also placed great emphasis on how Congress drafted 18 U.S.C. § 2520(2) and 26 U.S.C. § 7431(c) (the "other statutes"), two provisions structured quite differently from § 2724(b)(1). Both of the other statutes allow courts to award actual damages "or" statutorily liquidated damages, but § 2724(b)(1) eschews the disjunctive, explaining simply that courts may award "actual damages, but not less than liquidated damages in the amount of $2,500." Since § 2724(b)(1) does not use the word "or," the Florida district court inferred that Congress did not intend for plaintiffs to recover either actual damages "or" liquidated damages. Liquidated damages, in its view, are available only upon proof of actual damages. *See Kehoe*, at \*7.

This approach misconceives the judiciary's role in our constitutional system. While courts certainly remain responsible for interpreting laws, their labors must focus on discovering the legislature's intent in enacting particular statutes. Thus, *Kehoe* should have concentrated on discovering what Congress intended by the words that it chose to enact, not on whether other words—such as those used in the other statutes—might have made that intent more apparent. To be sure, Congress could have been clearer in the DPPA, but our role is to discern legislative intent, even when a statute's text does not readily reveal that intent.

■ In *Kehoe*, the Florida district court focused on the differences between the DPPA and the other statutes. While other parts of the United States Code sometimes inform statutory construction, courts should look to similarly phrased statutes to aid their interpretative labors. Looking to statutes

that use different language, as the *Kehoe* court did, may suggest that a certain statute was inartfully drafted, but it will not shed light on Congress's intent in enacting the statute at issue.

We have discovered five other places in the United States Code where language similar to § 2724(b)(1) appears.[32] Though we have not found reported cases considering whether four of these five statutes require proof of actual damages as a prerequisite to an award of liquidated damages, at least one district court has construed 47 U.S.C. § 551(f)(2). In *Warner v. American Cablevision of Kansas City*, 699 F.Supp. 851, 858–59 (D.Kan. 1988), that court held that "[n]o finding of actual damages or an actual invasion of privacy is required" for a plaintiff to recover under § 551(f)(2). This holding, of course, does not control our construction of the DPPA, but it does illustrate how interpretations of other, *similar* portions of the United States Code may illuminate otherwise murky questions of congressional intent.

To summarize, the *Kehoe* court based its interpretation of the DPPA on "1) consideration of the Supreme Court's decision in *Doe v. Chao*; 2) textual analysis of the Driver's Privacy Protection Act; 3) application of the rule of the last antecedent; 4) examination of the text of other relevant privacy statutes; and 5) examination of the purpose of the phrase 'liquidated damages' in the DPPA." *Kehoe*, at * 8. We do not find *Kehoe* persuasive because it misinterprets the significance of *Doe* to the DPPA, misapplies the rule of the last antecedent, overlooks other similarly phrased statutes (while inappropriately focusing on differently phrased statutes), and misunderstands the common law pedigree of the phrase "liquidated damages."

### c. *Schmidt v. Multimedia Holdings Corp.*

The third case relevant to the remedial issues here is *Schmidt v. Multimedia Holdings Corp.*, 361 F.Supp.2d 1346 (M.D.Fla. 2004). "Based on the language of the DPPA, the backdrop of privacy legislation, and the analogous common-law requirements to prove defamation *per quod*,"[33] the court there held that "the DPPA requires some proof of actual, pecuniary loss to qualify for liquidated damages of $2,500." *Id.* at 1356.

Notwithstanding the description of its reasoning just quoted, *Schmidt* appears rooted in a belief that "no legitimate interest would appear to justify a minimum $2,500 recovery for the DPPA's most abstractly defined injury—obtainment—for which the DPPA otherwise provides the incentive (attorneys' fees) and the relief (equitable injunction) for full redress." *Id.* at 1355–56. In other words, since the DPPA clearly provides for attorneys' fees and injunctions even in the absence of actual injury, the *Schmidt* court could *not* imagine any "legitimate" reason why Congress might have intended for violators to pay $2,500 when their violations cause no actual injury. On this point, we may be of some assistance.

While fee shifting may incentivize plaintiffs' attorneys to bring cases against violators, and while injunctions may prevent future misconduct, unless the DPPA provides for statutory damages of $2,500 even in the absence of actual damages, the plaintiffs themselves (*i.e.*, the victims of the invasion of privacy) would receive no compensation for past statutory violations (absent corroboration that they suffered some injury). It would have been "legitimate" for Congress to conclude that such victims deserve compensation, even if the amount of compensation appears to some to be an undeserved wind-

---

**32.** *See* 18 U.S.C. § 2710(c)(2) (2005) ("The court may award ... actual damages but not less than liquidated damages in an amount of $2,500 ...."); 47 U.S.C. § 338(i)(7) (2005) ("The court may award ... actual damages but not less than liquidated damages computed at the rate of $ 100 a day for each day of violation or $1,000, whichever is higher ...."); 47 U.S.C. § 551(f)(2) (2005) ("The court may award ... actual damages but not less than liquidated damages computed at the rate of $ 100 a day for each day of violation or $1,000, whichever is higher ....");

50 U.S.C. § 1810 (2005) (recognizing that an "aggrieved person" is entitled to recover "actual damages, but not less than liquidated damages of $1,000 or $100 per day for each day of violation, whichever is greater"); 50 U.S.C. § 1828 (2005) (same).

**33.** Even though it sat in the same state as the *Kehoe* court, the *Schmidt* court apparently found *Kehoe* to be so unpersuasive as to deserve no mention at all.

fall.[34] Moreover, Congress "legitimately" could have concluded that, unless it included a significant penalty for even those violations that did not actually cause damage, the DPPA would not sufficiently deter widespread, though minor, invasions of privacy.

We could say more about *Schmidt*, but suffice it for now to say that we do not find it persuasive.

### d. *Our Construction of § 2724(b)(1)*

Having reviewed these cases, we must return to our point of departure: does § 2724(b)(1) require a plaintiff to prove actual damages to qualify for the minimum statutory award of $2,500? *Kehoe* and *Schmidt* answer this question in the affirmative, but their reasoning is unpersuasive. Though we are bound by *Doe's* holding, that holding applies only to the Privacy Act and does not extend to the DPPA, a statute that uses materially different language.

■ Though no case controls our construction of § 2724(b)(1), we cannot overlook the Supreme Court's statement that, if Congress had intended to permit recovery of statutory damages without any showing of actual damages, it "could have accomplished its object simply by providing that the Government would be liable to the individual for *actual damages 'but in no case ... less than [a specified] sum ....'*" *Doe*, 124 S.Ct. at 1210, 124 S.Ct. 1204 (emphasis added). Because this suggested language parallels § 2724(b)(1) almost to the letter, we now hold that a plaintiff may recover liquidated damages of $2,500 under the DPPA even if she fails to prove actual damages.[35] Of course, if a plaintiff proves that she suffered more than $2,500 in actual damages, she may recover an amount sufficient to compensate her for the full extent of the harm she suffered.

### B. *Class Certification*

■ Plaintiffs have requested that we certify a nationwide class consisting of:

All persons who both (1) are or were employees of Cintas, family members or other persons who resided with Cintas employees, and/or persons whose vehicles were operated by Cintas employees, from July 1, 2002 through the present; and (2) had their personal information, as defined by the DPPA, obtained, used and/or disclosed by Defendants and/or their agents, without their consent, for uses not permitted by the DPPA, from July 1, 2002 through the present.

Pls.' Mot. at 1–2. Unfortunately, this proposal suffers from three serious deficiencies. First, it obscures important differences in what the evidence reveals about the actions of UNITE, the Teamsters, and Raynor. Second, it fails to describe a definite number of individuals because the class definition includes a temporal condition ("from July 1, 2002 through the present") without specifying a termination date. Finally, the reference to "uses not permitted by the DPPA" inextricably intertwines identification of class members with liability determinations.[36]

To side-step these difficulties, we shall not evaluate the class that plaintiffs propose, but focus instead on whether to certify three subclasses consisting of:

(1) All persons whose license plate numbers were used by UNITE, directly or indirectly, individually or jointly, as part of an effort to knowingly obtain, use and/or disclose personal information from motor vehicle records between July 1, 2002 and August 2, 2004 (the "UNITE subclass");

(2) All persons whose license plate numbers were used by the Teamsters, directly

---

**34.** Assuming that a knowing violation of the DPPA has occurred, the question of whether proof of actual damages is required to qualify for the minimum $2,500 award could be seen as a question of whether the person who violated the DPPA or the victim of the violation is entitled to $2,500. Congress could rationally have decided to protect the victim. Some may call an award a "windfall" in that case, but refusing to make the award can just as easily be seen as a "windfall" to one who knowingly violates the law.

**35.** This holding obviates the need for us to examine what kind of proof might be necessary to establish the existence of actual damages.

**36.** Essentially, the proposed class would consist of everyone to whom the defendants are liable under the DPPA.

**248**

or indirectly, individually or jointly, as part of an effort to knowingly obtain, use and/or disclose personal information from motor vehicle records between July 1, 2002 and August 2, 2004 (the "Teamsters subclass"); and

(3) All persons whose license plate numbers were used by Raynor, directly or indirectly, individually or jointly, as part of an effort to knowingly obtain, use and/or disclose personal information from motor vehicle records between July 1, 2002 and August 2, 2004 (the "Raynor subclass").

*See* Fed.R.Civ.P. 23(c)(4) (authorizing division of class into subclasses and maintenance of class action "with respect to particular issues"). Considering each subclass separately avoids conflating the defendants' conduct. By including an August 2, 2004 [37] cutoff for class membership, the parties (perhaps after additional discovery) will be more certain whether any particular individual is a member of the class. Most importantly, these new subclass definitions will permit the parties (and the courts) to assess whether class certification would be appropriate without delving too deeply into the merits of the subclasses' claims.

■ To obtain certification of a subclass, plaintiffs must establish all four of the prerequisites to a class action specified in Federal Rule of Civil Procedure 23(a) and satisfy the criteria articulated in at least one part of Rule 23(b). *See Baby Neal v. Casey*, 43 F.3d 48, 55 (3d Cir.1994). Our Court of Appeals has recognized that, "[i]n reviewing a motion for class certification, a preliminary inquiry into the merits is sometimes necessary to determine whether the alleged claims can be properly resolved as a class action." *Newton v. Merrill Lynch, Pierce, Fenner, & Smith*, 259 F.3d 154, 168 (3d Cir.2001). When necessary, therefore, we shall undertake such a preliminary inquiry into the merits to avoid "granting certification [that] may generate unwarranted pressure to settle non-meritorious or marginal claims." *Id.*

**37.** We selected August 2, 2004, the day precisely one month after defendants were served with the complaint, as the cut-off date because record evidence suggests that the defendants stopped their allegedly impermissible practices after

**1. *Rule 23(a)***

■ Before deciding whether plaintiffs meet any of the Rule 23(b) criteria, we must consider whether they can establish the prerequisites listed in Rule 23(a). *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 624 (3d Cir.1996), *aff'd sub nom. Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). The four prerequisites to a class action are:

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). As a shorthand, courts regularly refer to the prerequisites as numerosity, commonality, typicality, and adequacy of representation. *See, e.g., In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 527 (3d Cir.2004); *Georgine*, 83 F.3d at 624. These requirements "are meant to assure both that class action treatment is necessary and efficient and that it is fair to the absentees under the particular circumstances." *Baby Neal*, 43 F.3d at 55.

**a. *Numerosity***

The first prerequisite of any class action is that the class must be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). UNITE and Raynor "do not challenge ... that ... plaintiffs have satisfied the numerosity requirement." UNITE Mem. at 21; *see also* Rosen Decl. Ex. 4, ¶ 3. In view of this concession, we find that plaintiffs have established numerosity with respect to the UNITE and Raynor subclasses.

■ Although the Teamsters stipulated that "the number of Cintas persons [38] con-

learning about this lawsuit and the DPPA. *See* Raynor Dep. at 25; Mestrich Dep. at 116–17.

**38.** The stipulation defines "Cintas persons" as "individuals directly or indirectly related to Cintas." *See* Rosen Decl. Ex. 4, ¶ 3.

tacted at their homes by [Teamsters] representatives ... satisfies the numerosity requirements of Rule 23," Rosen Decl. Ex. 4, ¶ 4 (footnote added), they now argue that plaintiffs have failed to prove numerosity because "not all Cintas persons contacted by [the Teamsters] are class members," Teamsters Mem. at 19. In other words, it appears that the Teamsters admit contacting many Cintas persons without conceding that they obtained those persons' addresses, directly or indirectly, from motor vehicle records. Plaintiffs ask us to reject this "attempt to weasel out of the effect of [the] stipulation," but they fail to explain any flaw in the Teamsters's reasoning. Pls.' Reply at 4 n. 2.

The plain language of the stipulation recognizes only that the Teamsters contacted a large number of "Cintas persons" and does not even mention motor vehicle records. Only one paragraph prior to the Teamsters's limited stipulation, UNITE recognized that the number of Cintas persons "whose name and address [it] learned ... *through Motor Vehicle records* satisfies the numerosity requirements of Rule 23." Rosen Decl. Ex. 4, ¶ 3 (emphasis added). Plaintiffs did not insist upon any similar language in their stipulation with the Teamsters. Since they have neither a sufficiently precise stipulation nor other evidence relevant to the issue, we find that plaintiffs have failed to establish numerosity with respect to the Teamsters subclass.

### b. *Commonality*

The second prerequisite to class certification is that "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). The commonality threshold is relatively low because the named plaintiffs need only "share at least one question of fact or law with the grievances of the prospective class." *Baby Neal*, 43 F.3d at 56. "A finding of commonality does not require that all class members share identical claims, and indeed factual differences among the claims of the putative class members do not defeat certification." *In re Prudential Ins. Co. Sales Litig.*, 148 F.3d 283, 310 (3d Cir.1998) (quotations omitted).

Here, UNITE organizers collected license plate numbers from the Emmaus plant and used them to obtain names and addresses of potential Cintas employees. There is also evidence that UNITE engaged in similar conduct in eight other states. This pattern of activity raises common issues of fact and suggests that UNITE may have had a common purpose (or a common combination of purposes) in attempting to obtain names and addresses from license plates in so many locations. Indeed, UNITE explains that it needed to obtain names and addresses of Cintas employees to inform them about their opportunity to join the *Veliz* class. To the extent that the parties dispute whether the DPPA permits the use of motor vehicle records for such a purpose, *see* 18 U.S.C. § 2721(b)(4) (2005), a common question of law exists.

The Teamsters deny obtaining, disclosing, or using personal information from motor vehicles, but plaintiffs seem to believe that the Teamsters must have at least used information that UNITE obtained illegally. Regardless of which side is correct, the Teamsters subclass would raise common questions. If UNITE shared names and addresses with the Teamsters, a common factual issue would arise as to whether the Teamsters knew that UNITE obtained the information from motor vehicle records. Even if the Teamsters never received a single name or address from UNITE, the Teamsters could assert that common defense.

Similarly, Raynor appears not to have had any knowledge that UNITE was accessing motor vehicle records, so he may assert a common defense to the claims of all of the plaintiffs.

In short, we find that plaintiffs have demonstrated that commonality exists with respect to the UNITE, Teamsters, and Raynor subclasses.

### c. *Typicality*

In addition to numerosity and commonality, plaintiffs must show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). "The typicality requirement is designed to align the interests of the class and the class representatives so

that the latter will work to benefit the entire class through the pursuit of their own goals." *Barnes v. American Tobacco Co.*, 161 F.3d 127, 141 (3d Cir.1998). Thus, we must determine whether "the named plaintiff[s'] individual circumstances are markedly different or the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir.1985) (quotations and alterations omitted). Because typicality "acts as a bar to class certification only when the legal theories of the named representatives potentially conflict with those of the absentees," *Newton v. Merrill Lynch, Pierce, Fenner, & Smith*, 259 F.3d 154, 183 (3d Cir.2001) (quotations omitted), "even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories." *Baby Neal*, 43 F.3d at 58.

■ The UNITE subclass consists of all persons whose license plate numbers were used by UNITE, directly or indirectly, individually or jointly, as part of an effort to knowingly obtain, use and/or disclose personal information from motor vehicle records between July 1, 2002 and August 2, 2004. There is no dispute that the remaining nine plaintiffs belong to this subclass, *see* Naccaranto Dep. Ex. 2; Naccaranto Dep. Ex. 4, at 126, and they seek to recover under the same legal theory as the subclass as a whole—that UNITE violated the DPPA when it obtained their personal information from motor vehicle records. We find, therefore, that plaintiffs have established typicality with respect to the UNITE subclass.

■ There is no evidence, however, that any of the plaintiffs would be a member of the Raynor subclass or the Teamsters subclass. UNITE's site coordinators decided for themselves whether to access motor vehicle records, and their president, Raynor, had no involvement, direct or indirect, in obtaining, disclosing, or using personal information about the Emmaus employees (or any other employees) from motor vehicle records. *See* Raynor Dep. at 31–33. Thus, all of the plaintiffs have failed to establish that they would be members of the Raynor subclass. Since we cannot say that they would be members of the subclass, we cannot find that their claims would be typical of other individuals who might be members of the Raynor subclass.

■ Although the Teamsters and UNITE may have divided responsibility for contacting potential Cintas employees between themselves, the claims in this case arise out of knowingly obtaining, disclosing, and/or using their personal information from motor vehicle records, not out of contacting them *per se*. There is no evidence that the Teamsters and UNITE coordinated their efforts to obtain the names and addresses of potential employees at the Emmaus plant. As we already summarized, UNITE obtained this information primarily from motor vehicle records, but the Teamsters obtained names from a list of *Veliz* plaintiffs and addresses from internet databases. The Teamsters neither requested names and addresses from UNITE nor received names and addresses that they knew UNITE had obtained from motor vehicle records. *See* Kane Dep. at 145, 203–04.[39] UNITE never told the Team-

---

**39.** DeMay testified that UNITE provided some addresses to the Teamsters, *see* DeMay Dep. at 86–87, 98–99, but it appears that his testimony on that subject referred to the joint UNITE–Teamsters organizing effort in Illinois, where he was a site coordinator. Address-sharing in Illinois does not suggest that address-sharing also occurred in Pennsylvania because the unions coordinated about such subjects at the local level. Thus, we do not consider DeMay's testimony to be evidence that the Teamsters invaded the named plaintiffs' DPPA-protected privacy interests.

Further, even if UNITE provided to the Teamsters Pennsylvania addresses that it obtained from motor vehicle records, there is no evidence that the Teamsters *knew* that UNITE had obtained the addresses from motor vehicle records.

In this regard, we note that the Teamsters maintain a housecall form that includes Quinn's name and address. *See* Pls.' Deps. Ex. 5. The UNITE organizers who visited Quinn gave his name and address to Kane because they believed that Quinn "looked like a driver." Pls. Deps. Ex. 11 at 466; *see also* Kane Dep. at 148–151. Kane did not know that UNITE obtained Quinn's name and address from motor vehicle records. Kane Dep. at 153–54. Since there is no evidence suggesting that the Teamsters knew that Quinn's name and address came from motor vehicle rec-

sters that it obtained names and addresses from motor vehicle records, though Kane assumed that UNITE may have obtained some of them from "cars." Kane Dep. at 46, 48, 111–12[40]; Mestrich Dep. at 192–93, 201. In the absence of any evidence that the Teamsters knowingly obtained, disclosed, or used the named plaintiffs' personal information from motor vehicle records, we cannot find that the named plaintiffs' claims are typical of the claims of the Teamsters subclass as a whole.

### d. *Adequacy*

The final prerequisite to class certification is that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). "Adequacy of representation assures that the named plaintiffs' claims are not antagonistic to the class and that the attorneys for the class representatives are experienced and qualified to prosecute the claims on behalf of the entire class." *Baby Neal*, 43 F.3d at 55. To assess this factor, our Court of Appeals has explained that we should inquire into whether (1) counsel is qualified to represent that en-

tire class; and (2) the named plaintiffs have conflicts of interest with other members of the proposed class. *See Georgine*, 83 F.3d at 630. Since defendants do not contest that Spector Gadon is as qualified to represent the class as any firm whose fees are advanced by Cintas could be, *see also* Rosen Decl. ¶¶ 8–10 (summarizing Spector Gadon's qualifications to represent the subclasses),[41] we may focus on potential conflicts of interest between the named plaintiffs and other members of the subclasses.

█ Defendants contend that the named plaintiffs cannot adequately represent the absent class members because Cintas could pressure the named plaintiffs to pursue or discontinue this litigation to serve the company's ends, regardless of the effect on the class. See UNITE Mem. at 29–33.[42] According to defendants, Cintas has the ability to exert this influence because it employs the plaintiffs (or their friends or family members) and because it advances the costs of this litigation as well as Spector Gadon's fees.

If we were to certify one or more of the subclasses, however, whatever leverage Cintas may have over the named plaintiffs would

---

ords, Quinn is not a typical member of the Teamsters subclass.

**40.** Plaintiffs believe that "Kane admitted that he learned of [UNITE's] practice [of recording license plate numbers] *prior* to the filing of this lawsuit." Pls.' Reply at 8 (citing Kane Dep. at 113). When read in context, however, the meaning of Kane's testimony is far from clear. *See* Kane Dep. at 112 (answering "No" to the question "Prior to the institution of the lawsuit, did you learn they were doing that [ (*i.e.*, UNITE was recording license plate numbers) ]?"). Taking his testimony as a whole, we find that Kane did not admit knowing, before this lawsuit was filed, that UNITE had recorded license plate numbers.

**41.** We would be remiss not to acknowledge that Spector Gadon exhibited commendable, and all too rare, candor in bringing to our attention *Schmidt v. Multimedia Holdings Corp.*, a decision adverse to its clients' interests. *See* Pls.' Reply at 10 n. 9. This ethical demonstration confirms that Spector Gadon is well-qualified to represent the absent class members.

**42.** In a related argument, the defendants submit that we should not certify a class because § 101(a)(4) of the Labor–Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 411(a)(4) (2005), prohibits "interested employ-

ers" from "directly or indirectly financ[ing], encourag[ing], or participat[ing] in, except as a party," any action brought by a "member" of a labor organization. *See* UNITE Mem. at 33–35. Section 101(a)(4) does not appear to apply to this case because the named plaintiffs are not "member[s]" of any labor organization. If a class is certified, and if some members of that class are union "members," Cintas may have to discontinue its support of this litigation to comply with the LMRDA.

Even if section 101(a)(4) applied to this case, defendants have cited no authority for the proposition that a court should decline to certify a class seeking to vindicate its statutory rights because a third party has violated a different statute. Nor have they cited any authority for the proposition that Cintas's alleged violation of the LMRDA, if proven, would constitute a "substantive defense to this litigation." *See* UNITE Mem. at 33 n. 9. While defendants might pursue an independent LMRDA claim against Cintas, 29 U.S.C. § 412; *see, e.g., Auto Workers v. Nat'l Right to Work Legal Defense & Educ. Found.*, 590 F.2d 1139 (D.C.Cir.1978) (exemplifying a union's suit to enforce section 101(a)(4)), we are unaware of any case holding that section 101(a)(4) creates an affirmative defense in the action that the employer finances, encourages, or participates in.

not permit it to control the conduct of this case because Spector Gadon would owe a duty of loyalty not only to the named plaintiffs but to all class members. Thus, Spector Gadon would have to decline to follow even the named plaintiffs' explicit instructions to settle the case if it concluded that acting on those orders would not be in the absent class members' best interests.

Though Cintas now advances its fees, Spector Gadon has robust incentives to maximize the class's total recovery because it will receive a reasonable percentage of that recovery. In view of this potential for a sizeable fee award, it seems especially unlikely that Spector Gadon would breach its duty of loyalty by settling this case too cheaply. *See also Vanderbilt v. Geo-Energy Ltd.*, 725 F.2d 204, 210 (3d Cir.1983) (rejecting suggestion that "there is something inherently perfidious in an arrangement whereby a litigant's counsel fees and litigation expenses are financed by someone other than the litigant"). Assuming *arguendo* that Spector Gadon did violate its fiduciary duties to the absent class members, no settlement could take effect without our approval, and we will continue to protect absent class members, especially now that defendants have alerted us to the potential, however remote, that Cintas could influence this litigation.

Even if Cintas somehow retained the power to manipulate this case, we doubt that it would exercise that power to disadvantage the absent class members. First, Cintas agreed not to "interfere" with Spector Gadon's relationship with the named plaintiffs or the "independence of [its] professional judgment, particularly with regard to the handling of this matter in the best interests of the plaintiffs." Rosen Decl. Ex 12, at 2. Moreover, the entire record suggests that Cintas remains unwaiveringly committed to maintaining a union-free workplace and the unions remain equally dedicated to organizing Cintas's employees. Given these entrenched positions, Cintas is most likely to exert whatever influence it has to inflict the maximum possible damage on the unions. Cintas's interest in crippling the unions thus aligns perfectly with the class's interest in a large recovery.

In addition to the supposed potential for conflict between Cintas and the class, defendants also argue that a conflict of interest exists between the relatively anti-union named plaintiffs and the many pro-union Cintas employees who would be members of the subclasses. *See* UNITE Mem. at 35–40. Apparently innocent of any sense of irony, this argument suggests that the named plaintiffs will pursue this case too vigorously while defendants had earlier claimed that the named plaintiffs would be too willing to surrender if Cintas requested it.

Putting aside the inconsistency in these positions, we note again that the short-run financial interests of the named plaintiffs and the pro-union Cintas employees are identical: both groups would benefit from a damage award here.[43] To the extent that any "conflict" exists, it centers around their attitude toward unionization. This lawsuit, however, is not a referendum on the desirability of unionization; it is an inquiry into whether a particular organizing tactic violates the DPPA. While some pro-union ideologues may believe that the unions should be permitted to employ any organizing tactic that they find useful, other pro-union employees may prefer that the unions cease using some tactics, including the use of motor vehicle records to obtain names and addresses. Further, while some employees may prefer unionization to non-unionization, we suspect that even pro-union employees would prefer unionization plus $2,500 in damages to either unionization alone or to non-unionization.[44]

We do not pretend to have canvassed the entire field of possible sentiments among Cintas employees, but the foregoing discussion illustrates the potential problems with defendants' assumption (which lacks any evidentiary support) that all pro-union employees have a conflict of interest with the named

43. Although the unions did not make this point in their briefs, we recognize that they probably believe that the long-term financial benefits of union membership exceed the value of any monetary recovery the class may receive in this case.

44. There is no evidence that the unions would stop their organizing campaign against Cintas even if they lost this case.

plaintiffs.[45] More fundamentally, even if we accepted defendants' invitation to presume that a large number of absent class members would oppose continuing this litigation, we could still find that plaintiffs have established adequacy because Rule 23 requires only that the named plaintiffs "fairly and adequately *protect* the interests of the class." Fed. R.Civ.P. 23(a)(4) (emphasis added). The named plaintiffs are clearly attempting to protect the class's DPPA-created privacy interests, and the (theoretical) existence of a group of class members that would prefer to sacrifice those interests does not suggest that the named plaintiffs are in any way inadequate representatives.

Because there are no conflicts of interest that would prevent the named plaintiffs from fairly and adequately representing the absent class members, we hold that the plaintiffs have satisfied the requirements of Rule 23(a)(4) with respect to the UNITE, Teamsters, and Raynor subclasses.

### e. *Summary of Prerequisites*

We have held that the named plaintiffs failed to demonstrate that the members of the Teamsters subclass are so numerous that joinder of all members is impracticable. The named plaintiffs also have not shown that their claims are typical of the claims of the absent members of the Teamsters and/or Raynor subclasses. Since plaintiffs have not established all four of the prerequisites with respect to them, we shall not certify either the Teamsters subclass or the Raynor subclass.

Still, plaintiffs have established numerosity, commonality, typicality, and adequacy with respect to the UNITE subclass, so we may certify that subclass if they can also satisfy the criteria articulated in at least one of the parts of Rule 23(b).[46]

### 2. *Rule 23(b)*

Once a group of plaintiffs has satisfied the requirements of Rule 23(a), it cannot obtain class certification without showing that:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed.R.Civ.P. 23(b). Eschewing only the possibility of certification pursuant to Rule 23(b)(1)(B), plaintiffs submit that we could certify the class under Rule 23(b)(1)(A), (b)(2), or (b)(3). *See* Pls.' Mem. at 30–39. We shall consider separately each alternative.

### a. *Rule 23(b)(1)(A)*

▆▆▆ Rule 23(b)(1)(A) permits class certification where "the prosecution of separate actions by or against individual members of the class would create a risk of . . . inconsistent or varying adjudications with respect to

---

**45.** Indeed, there is no evidence in the record suggesting how many of Cintas's employees favor unionization, much less how many of the pro-union employees oppose this litigation.

**46.** Because only one of the three subclasses satisfies the prerequisites for certification, we may certify, at most, one subclass. With the possibility of certifying only one "subclass," however, referring to "subclasses" becomes awkward. Thus, we shall refer to the UNITE subclass simply as "the class" for the remainder of this Memorandum.

individual members of the class which would establish incompatible standards of conduct for the party opposing the class." Were we not to certify the class, at least a few of the scores of individuals who have expressed interest in joining this lawsuit probably would file suits of their own around the country. *See* Friedman Decl. ¶ 3. The DPPA is a relatively young statute, and this case presents the first opportunity for a federal court to consider its application to a union organizing campaign. While we are confident that we have construed it correctly, there is a "risk" that another court could interpret the DPPA differently (as we interpret it differently from the *Kehoe* and *Schmidt* courts). If that were to occur, the inconsistent adjudications would establish incompatible standards of conduct for UNITE. Thus, we could certify the class pursuant to Rule 23(b)(1)(A).

### b. *Rule 23(b)(2)*

We may certify a class under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."

■ UNITE acted "on grounds generally applicable" to the class. The class includes all persons whose motor vehicle records UNITE knowingly obtained, disclosed, or used as part of the organizing campaign, and the record does not suggest any material differences in the members' circumstances. As part of the campaign, UNITE wanted to make contact with as many Cintas employees as possible. To that end, it employed the time-tested tactic of using license plate numbers to obtain names and addresses from motor vehicle records. There may have been minor state-to-state variations in who decided to access motor vehicle records or in how UNITE obtained drivers' personal information, but the record clearly demonstrates that "UNITE obtained from Motor Vehicle records the name and address information of persons presumed to be employed by Cintas Corporation" in nine states. Rosen Decl. Ex. 2, at 5. Although UNITE had multiple purposes for contacting employees—to investigate working conditions, to gauge interest in unionization, and to recruit new members of the *Veliz* class, *see* Mestrich Dep. at 199; DeMay Dep. at 51, 89—it attempted to make contact with employees for all of these purposes. Because UNITE acted similarly and for similar purposes with respect to all class members, we find that UNITE acted "on grounds generally applicable" to the class.

Nevertheless, defendants submit that we may not certify a(b)(2) class in this case because plaintiffs seek substantial liquidated damages and "certification under Rule 23(b)(2) is proper only where the primary relief sought is injunctive." Teamsters Mem. at 20. Our Court of Appeals has stated that "[s]ubsection (b)(2) class actions are limited to those class actions seeking *primarily* injunctive or corresponding declaratory relief." *Barnes v. American Tobacco Co.*, 161 F.3d 127, 142 (3d Cir.1998) (quotations omitted and emphasis added). Moreover, Rule 23(b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or *predominately* to money damages." Fed. R.Civ.P. 23 advisory committee's note (emphasis added). We read *Barnes's* reference to classes seeking "primarily" equitable relief as describing precisely those classes that do not seek "predominately" money damages. In other words, the Court of Appeals's notion of "primacy" is coextensive with the Advisory Committee's understanding of "predominance."

In this case, plaintiffs seek statutory and punitive damages as well as injunctive and declaratory relief, *see* Am. Compl. at 14, raising a question as to whether they seek "predominately" (or "primarily") legal or equitable relief. Since no precedential opinion of our Court of Appeals has addressed this issue in any detail, we look to other circuits for guidance. *But see In re School Asbestos Litig.*, 789 F.2d 996, 1008 (3d Cir.1986) (affirming district court's refusal to certify a(b)(2) class where plaintiffs' claims were "essentially for damages"); *Barabin v. Aramark Corp.*, No. 02–8057, 2003 WL 355417, at *1–2 (3d Cir. Jan. 24, 2003) (discussing the issue in unpublished decision).

In *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir.1998), the Fifth Circuit became the first federal appellate court to articulate principles for when monetary relief "predominates" so as to preclude certification of a(b)(2) class. After explaining that the predomination requirement "protects the legitimate interests of potential class members who might wish to pursue their monetary claims individually ... and ... preserves the legal system's interest in judicial economy," the court held that "monetary relief predominates in (b)(2) class actions unless it is incidental to requested injunctive or declaratory relief." *Id.* at 415. This approach essentially presumes that a class seeking monetary relief cannot be certified under Rule 23(b)(2), but it permits plaintiffs to rebut that presumption if they can show that their requested money damages are only "incidental" to the equitable relief they seek.

Further describing how to rebut the presumption against certifying a(b)(2) class that seeks money damages, the Fifth Circuit continued:

> By incidental, we mean damages that flow directly from liability to the class *as a whole* on the claims forming the basis of the injunctive or declaratory relief. Ideally, incidental damages should be only those to which class members automatically would be entitled once liability to the class (or subclass) as a whole is established. That is, the recovery of incidental damages should typically be concomitant with, not merely consequential to, class-wide injunctive or declaratory relief. Moreover, such damages should at least be capable of computation by means of objective standards and not dependent in any significant way on the intangible, subjective differences of each class member's circumstances. Liability for incidental damages should not require additional hearings to resolve the disparate merits of each individual's case; it should neither introduce new and substantial legal or factual issues, nor entail complex individualized determinations. Thus, incidental damages will, by definition, be more in the nature of a group remedy, consistent with the forms of relief intended for (b)(2) class actions.

*Id.* at 415 (citations omitted). The Eleventh and Seventh Circuits have followed the Fifth Circuit's "bright-line" approach. *See Murray v. Auslander*, 244 F.3d 807, 812 (11th Cir.2001); *Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894, 898–99 (7th Cir.1999).

The Second Circuit, however, noted that the bright-line approach "forecloses (b)(2) class certification of all claims that include compensatory damages (or punitive damages) even if the class-wide injunctive relief is the form of relief in which the plaintiffs are primarily interested." *Robinson v. Metro–North Commuter R.R. Co.*, 267 F.3d 147, 163 (2d Cir.2001) (quotations omitted). Moreover, the Fifth Circuit's approach ignored "the fact that Rule 23 has historically been understood to vest district courts with the authority to determine whether, in their informed discretion, based on the particulars of the case, the certification prerequisites have been satisfied." *Id.* at 164 (quotations omitted). For these reasons, the Second Circuit declined to adopt the bright-line approach, holding instead that:

> [W]hen presented with a motion for (b)(2) class certification of a claim seeking both injunctive relief and non-incidental monetary damages, a district court must consider the evidence presented at a class certification hearing and the arguments of counsel, and then assess whether (b)(2) certification is appropriate in light of the relative importance of the remedies sought, given all of the facts and circumstances of the case. The district court may allow (b)(2) certification if it finds in its informed, sound judicial discretion that (1) the positive weight or value to the plaintiffs of the injunctive or declaratory relief sought is predominant even though compensatory or punitive damages are also claimed, and (2) class treatment would be efficient and manageable, thereby achieving an appreciable measure of judicial economy.

*Id.* (quotations, alterations, and citations omitted). Though this "ad hoc" approach complicates the analysis when a class seeks "non-incidental monetary damages," it recognizes that a class seeking incidental damages may be certified under Rule 23(b)(2). *See id.*

at 165 ("This presumption of cohesion and unity continues where incidental damages are ... sought because entitlement to such damages does not vary based on subjective considerations of each class member's claim ...."). Moreover, the Second Circuit approved of *Allison*'s definition of "incidental damages." *See id.* at 164. The Ninth Circuit has joined the Second Circuit in rejecting the bright-line approach in favor of an ad hoc approach. *See Molski v. Gleich*, 318 F.3d 937, 949–950 (9th Cir.2003).[47]

Our Court of Appeals has not explicitly considered whether to adopt the bright-line approach or the ad hoc approach toward certifying a(b)(2) class that seeks non-incidental damages. Still, one of its unpublished decisions explains that, "where parties seek monetary relief, a court may only certify a [ (b)(2) ] class if the damages claim is incidental to the primary claim for injunctive or declaratory relief." *Barabin*, 2003 WL 355417, at *1. Essentially restating (albeit in shorthand) the bright-line approach, this statement suggests that the Court of Appeals will join the Fifth, Seventh, and Eleventh Circuits when an appropriate case reaches it.

■■■ Returning now to the case before us, the named plaintiffs seek liquidated damages[48] and punitive damages in addition to equitable remedies. *See* Am. Compl. at 14. If they prove that UNITE is liable, the class members "automatically would be entitled" to liquidated damages that would be "capable of computation by means of objective standards and not dependent in any significant way on the intangible, subjective differences of each class member's circumstances." *Allison*, 151 F.3d at 415. Similarly, the class as a whole seeks punitive damages because it believes that UNITE engaged in a pattern of

willfully and/or recklessly disregarding the DPPA. *See* 18 U.S.C. § 2724(b)(2) (2005). Since UNITE directed this pattern at the class as a whole, any punitive damage award would not depend on "complex individualized determinations" or "require additional hearings to resolve the disparate merits of each individual's case." *Allison*, 151 F.3d at 415. The statutory and punitive damages that the class seeks are "more in the nature of a group remedy," so we find that they are "incidental" to the requested equitable relief. As the class seeks only incidental damages, its request for damages does not preclude certification under Rule 23(b)(2). We need not choose between the bright-line approach and the ad hoc approach because the result would be the same under either of them.

■■■ Though UNITE acted on grounds generally applicable to the class and we may certify a(b)(2) class that requests incidental damages, we must also assure ourselves that final injunctive relief would be "appropriate." In this circuit, courts analyze the propriety of injunctive relief under the rubric of "cohesiveness." *See Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 248 (3d Cir.1975) (explaining that a(b)(2) "class must be cohesive as to those claims tried in the class action"). "Indeed, a(b)(2) class may require more cohesiveness than a(b)(3) class ... because in a (b)(2) action, unnamed members are bound by the action without the opportunity to opt out." *Barnes*, 161 F.3d at 142–43.

As we have already discussed, defendants point out that at least some Cintas employees support UNITE's organizing campaign and want it to continue. *See generally* Kennedy Decl. Exs. EE to OO. Far from hoping to

**47.** The Sixth Circuit has noted the division of opinion among the circuits, but it has not taken a position on the proper approach. *Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 574 (6th Cir.2004).

**48.** Technically, they request "monetary damages ... in an amount not less than the statutory-provided liquidated damages of $2,500." Am. Compl. at 14, ¶ 1. Though this phrasing leaves open the possibility that some class members could receive more than $2,500 if they could prove that their actual damages exceeded that amount, we could not certify *any* class if plain-

tiffs pressed their entitlement to individualized damages determinations. In addition, the evidence suggests that no class member actually suffered more than $2,500 in damages. We therefore presume that plaintiffs now seek only statutory damages of $2,500 each, regardless of what they may have sought in the amended complaint. If plaintiffs intend to press their right to recover more than $2,500 in actual damages, they should notify us within ten days so that UNITE may file a motion to reconsider our certification decision.

stop UNITE from using information that it obtained through their motor vehicle records, these pro-union employees want UNITE to keep in contact with them. A(b)(2) class, however, would seek an injunction forbidding UNITE from contacting all class members, including pro-union members. *See* Am. Compl. at 14, ¶ 5. Though pro-union members might prefer to be exempt from such an injunction, Rule 23 does not provide them with an opportunity to opt out of a(b)(2) class. We find, therefore, that existence of pro-union and anti-union factions within the class renders it insufficiently cohesive to qualify for certification under Rule 23(b)(2).[49]

### c. *Rule 23(b)(3)*

If we find that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy," we may certify the class under Rule 23(b)(3). As shorthand, courts frequently refer to these twin requirements as predominance and superiority. *See, e.g., Prudential,* 148 F.3d at 313.

### i. *Predominance*

"The Rule 23(b)(3) predominance inquiry tests whether the class is sufficiently cohesive to warrant adjudication by representation, and mandates that it is far more demanding than the Rule 23(a)(2) commonality requirement." *In re LifeUSA Holding Inc.,* 242 F.3d 136, 144 (3d Cir.2001). To satisfy the test, "the common issues must constitute a 'significant part' of the individual cases." *Chiang v. Veneman,* 385 F.3d 256, 273 (3d Cir.2004).

 We have no difficulty finding that common issues predominate over individual issues in this case. UNITE admits it has obtained personal information about the class members from motor vehicle records and has not argued that it had different reasons for getting each class member's information. There may have been several reasons why UNITE wanted to make contact with each Cintas employee, but the same set of reasons applied to all of the class members. While some class members may have received phone calls and others home visits, these differences are immaterial because UNITE would have violated the DPPA if it obtained personal information from motor vehicle records for an impermissible purpose, regardless of how it later actually used the information. Similarly, it would not matter whether UNITE used a single intermediary to obtain the personal information from motor vehicle records or if it used different agents in different parts of the country to obtain it because the only material issue concerns whether, not how, it was obtained. Because UNITE's liability would not depend upon which organizer decided to access motor vehicle records (or that organizer's knowledge of the DPPA), the fact that its site coordinators each decided independently how to obtain employees' names and addresses, without any centralized direction or coordination, does not suggest that individual issues predominate over common ones.

Significantly, defendants cannot point to a single issue that requires separate determination for each class member. The Teamsters might have claimed that each class member would have had to make "an individual showing of 'knowledge' " had we certified the Teamsters subclass, *see* Teamsters Mem. at 10–11, but we need not resolve that issue because plaintiffs failed to establish numerosity and typicality with respect to that subclass. UNITE cannot make a similar argument because it admits to obtaining names and addresses from motor vehicle records in

**49.** Our finding that the class lacks the cohesiveness that Rule 23(b)(2) requires is not inconsistent with our earlier finding that the named plaintiffs can adequately represent the class's interests even though some class members support the union. While the inquiry into cohesiveness focuses on whether the class members share common goals, the adequacy analysis requires only consideration of whether the named plaintiffs suffered the same kind of legally recognized injury as the absent class members. Here, the named plaintiffs are adequate representatives of the pro-union employees, within the meaning of Rule 23(a)(4), because UNITE violated both groups' DPPA privacy rights. Since the pro-union employees may not want to remedy that violation, however, we believe that the class is not cohesive enough to require them to participate.

nine states and does not deny "knowing" that it did so.[50]

While defendants contend that the DPPA requires determination of each class members' damages individually, this argument rests on the faulty premise that plaintiffs are not entitled to liquidated damages of $2,500 without proof of actual damages. As we already held, however, plaintiffs may recover liquidated damages even if they fail to show that they suffered any actual damage. The DPPA fixes the amount of damages, so individualized determinations will be unnecessary.

In short, we find that questions of law and fact common to the class members predominate over any questions affecting only individual members.[51]

### ii. *Superiority*

"The superiority requirement 'asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication.'" *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 533–34 (3d Cir. 2004) (quoting *Prudential*, 148 F.3d at 316). In considering whether a class action is the fairest and most efficient method of adjudication, we should consider, among other matters:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3).

■■■ The first matter weighs neither in favor nor against class certification because the class members do not appear to have any particular interest in individually controlling the prosecution of separate actions. Although there is no similar litigation pending, scores of individuals could file similar suits if we do not incorporate their claims into a class action. *See* Friedman Decl. ¶ 3. It would conserve judicial resources to head off separate litigation by concentrating all of these claims into a class action, and we perceive no particular advantages or disadvantages to concentrating them in this forum. Finally, the claims in this case are relatively straightforward and do not involve any significant individual issues, so we do not expect to encounter great difficulties in managing a class action.

Nevertheless, defendants argue that "'a class action is not superior where it would result in relatively small recoveries for individual class members while either exposing defendants to large administrative costs or consuming judicial resources, on top of the necessary abundance of court time for supervision.'" Teamsters Mem. at 18 (quoting *Kline v. Security Guards, Inc.*, 196 F.R.D. 261, 274 (E.D.Pa.2000) (Van Antwerpen, J.),[52] *vacated*, 386 F.3d 246 (3d Cir.2004)); *see also Forman v. Data Transfer, Inc.*, 164 F.R.D. 400, 405 (E.D.Pa.1995) (Giles, J.) ("A class action would be inconsistent with the specific and personal remedy provided by Congress to address the minor nuisance of unsolicited facsimile advertisements."); *Ratner v. Chemical Bank N.Y. Trust Co.*, 54 F.R.D. 412, 416 (S.D.N.Y.1972) (finding that class action was not superior method of adjudicating claims

---

**50.** To the extent that UNITE adopts the Teamsters's claim that one cannot be liable for violating the DPPA without knowing the purpose for which personal information was obtained to be impermissible, *see* Teamsters Mem. at 10 n. 15, we have already rejected that construction of the statute.

**51.** Our finding that common issues predominate over individual issues is not inconsistent with our earlier finding that the class was insufficiently cohesive to be certified under Rule 23(b)(2) be-

cause "a (b)(2) class may require more cohesiveness than a(b)(3) class." *Barnes*, 161 F.3d at 142.

**52.** Defendants take this quotation from the district court's opinion in *Kline* out of context. The court was merely "not[ing] the finding of some courts" without expressing an opinion on whether those cases were rightly decided. *See Kline*, 196 F.R.D. at 274.

when "the proposed recovery of $100 each for some 130,000 class members would be a horrendous, possibly annihilating punishment, unrelated to any damage to the purported class or to any benefit to defendant, for what is at most a technical and debatable violation of the Truth in Lending Act").

In essence, defendants contend that the sheer size of their potential liability ought to preclude class certification.[53] Without expressing any opinion on that general principle, we cannot yet apply it to this case because we do not know how many people are members of the class. Though UNITE concedes that it accessed motor vehicle records in nine states, we do not know how many records were accessed. The record shows only that UNITE accessed records related to about seventy vehicles parked at the Emmaus lot. *See* Rosen Decl. Ex. 26. If UNITE accessed about 100 records in each of the nine states, its exposure would be $2.25 million, a sizeable sum to be sure, but not so large a figure that we are now prepared to hold that such *potential* exposure precludes class certification. *See Parker v. Time Warner Entm't Co.*, 331 F.3d 13, 21–22 (2d Cir.2003) (expressing concern, but declining to hold, that the possibility that defendant could face liability of $12 *billion* could preclude class certification). Should discovery reveal that UNITE's worst fears are realized, we can revisit the issue at that time. *See* Fed.R.Civ.P. 23(c)(1)(C) ("An order [certifying a class action] may be altered or amended before final judgment.").[54]

With so many potential plaintiffs clamoring to join in, a class action will be a far more efficient mechanism to adjudicate the class members' claims than dozens of copy-cat suits pending across the country. The record does not yet suggest that certifying a (b)(3) class, which includes the right to opt-out, would be unfair to anyone, so we find that plaintiffs have met their burden of showing that a class action is superior to other

methods for the fair and efficient adjudication of this case.

Since common issues predominate over individual issues and a class action is superior to other adjudicatory mechanisms, we could certify the class under Rule 23(b)(3).

### 3. *Certification Decision*

■■■ For the reasons explained above, we could certify the class under Rule 23(b)(1)(A) or (b)(3). Although the choice between these certifications has profound implications for absent class members' rights to notice and to demand exclusion from the class, *see* Fed. R.Civ.P. 23(c)(2) (requiring notice and the right to opt out only in (b)(3) class actions), the parties have not cited any authority that could inform our selection.

Other courts confronted with this decision have recognized some tension in permitting class members to opt-out and pursue individual actions, as Rule 23(b)(3) does, if separate actions would subject the defendant to the risk of "inconsistent or varying adjudications," as must be the case for the class to be eligible for certification under Rule 23(b)(1)(A). *See Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1351–53 (11th Cir.2001); *DeBoer v. Mellon Mortgage Co.*, 64 F.3d 1171, 1175 (8th Cir.1995); *In re A.H. Robins Co.*, 880 F.2d 709, 728 (4th Cir.1989); *First Federal v. Barrow*, 878 F.2d 912, 919–920 (6th Cir.1989); *Reynolds v. Nat'l Football League*, 584 F.2d 280, 284 (8th Cir.1978); *Robertson v. Nat'l Basketball Ass'n*, 556 F.2d 682, 685 (2d Cir.1977); *Green v. Occidental Petroleum Corp.*, 541 F.2d 1335, 1340 (9th Cir.1976); *see also Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 119 (3d Cir.1990) (recognizing similar preference for (b)(2) classes over (b)(3) classes). In other words, if a court has already held that separate actions could put the defendant in an impossible situation, then the court ought not permit the prosecution of separate actions by affording absent class members the right to opt out.

---

**53.** Cintas employs about 28,000 people, and the DPPA provides for liquidated damages of $2,500 per violation. Multiplying these figures suggests that UNITE may face liability of up to $70 million (excluding punitive damages) if a class is certified.

**54.** Even if plaintiffs demonstrate that UNITE violated the DPPA, we "may" decline to award liquidated damages. *See* 18 U.S.C. § 2724(b) (2005).

This reasoning has considerable force in the ordinary case, where class members choose to opt out because they hope to obtain a larger recovery in a separate action. This case, however, is far from ordinary. First, it is unlikely that the possibility of a richer damages award would inspire any class member to opt out because all class members would be entitled to the same $2,500 recovery in a separate action as they are entitled to in a class action.

Though the tug of fortune probably would not induce any members to opt out, defendants suggest that a deep-seated commitment to the union might encourage opt outs. They contend that some pro-union Cintas employees would prefer to forfeit their claims against UNITE. These individuals might opt out not to pursue separate actions, but to avoid participating in *any* action. Since providing those pro-union employees an opportunity to opt out of this case would not increase the risk of subjecting UNITE to inconsistent adjudications (because the opt outs will not file individual actions), we see no reason to prefer (b)(1) certification to (b)(3) certification. To the contrary, (b)(3) certification actually reduces UNITE's potential liability without substantially prejudicing the class.

Unfortunately, (b)(3) certification is not costless. All class members must receive notice of the action and of their right to opt out, and providing this notice can be expensive. In the first instance, Cintas (or Spector Gadon) will bear the burden of this expense, but UNITE may ultimately have to pay it. *See* 18 U.S.C. § 2724(b)(3) (2005). Thus, UNITE will reap the benefits of (b)(3) certification (in the form of potentially reduced liability if fervently pro-union employees opt out), but it could also shoulder the attendant costs if it does not prevail.[55] Because we believe that UNITE is in the best position to serve as a proxy for pro-union class members faced with this choice, we may defer to its judgment about whether (b)(1) or (b)(3) certification would be more advantageous. Until it informs us otherwise, however, we shall presume that it would prefer to protect the pro-union class members' rights to opt out of

this litigation, so we shall certify the class under Rule 23(b)(3).

### C. *Class Counsel*

When certifying a class, we "must appoint class counsel" who can "fairly and adequately represent the interests of the class." Fed.R.Civ.P. 23(g)(1)(A), (B). In making the appointment, we must consider:

the work counsel has done in identifying or investigating potential claims in the action,

counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action,

counsel's knowledge of the applicable law, and

the resources counsel will commit to representing the class.

Fed.R.Civ.P. 23(g)(1)(C)(i). After considering all of these factors, we find that Spector Gadon can fairly and adequately represent the class's interests.

Spector Gadon investigated the named plaintiffs' claims and determined that a sufficient factual and legal basis existed to file a class action complaint. Before they filed the complaint, few courts had interpreted the DPPA, and the basis for the class's claim was not well established. Still, Spector Gadon executed a litigation strategy that results today in certification of a class action. From the motion to dismiss through discovery and now to class certification, Spector Gadon's extensive litigation experience has served the class well. *See* Rosen Decl. ¶ 8. Moreover, we cannot imagine that any firm is more knowledgeable than Spector Gadon about DPPA class actions, especially as they relates to federal labor law, because this case is the first of its kind. Cintas has agreed to advance the costs of this litigation, so we need not worry that insufficient resources will be available to protect the class's interests. Even if Cintas reneged on its commitment, we have no reason to doubt Spector Gadon's claim that it possesses the wherewithal to continue. *See* Rosen Decl. ¶ 9. In short, Spector Gadon can fairly and adequately rep-

**55.** Based on the evidence adduced so far, UNITE

faces an uphill battle to avoid liability.

resent the class's interests, so we shall appoint it as class counsel.

*Conclusion*

The named plaintiffs requested that we certify a class that could assert claims against UNITE, Raynor, and the Teamsters. We cannot allow a class action to proceed against Raynor or the Teamsters because plaintiffs failed to satisfy all four of the Rule 23(a) prerequisites with respect to those defendants. Though plaintiffs have demonstrated that we could certify a(b)(1)(A) class or a (b)(3) class to assert claims against UNITE, we believe that the unique circumstances of this case demand that the absent class members receive an opportunity to opt out. Thus, pursuant to Rule 23(b)(3), we shall certify a class consisting of all persons whose license plate numbers were used by UNITE, directly or indirectly, individually or jointly, as part of an effort to knowingly obtain, use and/or disclose personal information from motor vehicle records between July 1, 2002 and August 2, 2004.

An appropriate Order follows.

### ORDER

AND NOW, this 31st day of May, 2005, upon consideration of plaintiffs' motion for class certification (docket entry # 56), their memorandum in support thereof, defendants' memoranda in opposition thereto, plaintiffs' reply brief, the declarations of Paul R. Rosen, Michael S. Friedman, and Thomas M. Kennedy, the affidavits of Joseph E. Kolick and Ahmer Qadeer, and the complete depositions of the named plaintiffs, the defendants' representatives, and Greg Hart, Jo Naccarato, and John Rea, and in accordance with the accompanying Memorandum and Fed. R.Civ.P. 23(c)(1)(A) and (g)(1)(A), it is hereby ORDERED that:

1. The claims of Kathleen Kelly, Carri Daubert, and Deborah Sabastro are DISMISSED for lack of standing;

2. Plaintiffs' motion for class certification is GRANTED IN PART;

3. Pursuant to Fed.R.Civ.P. 23(b)(3), a class is CERTIFIED to consist of: All persons whose license plate numbers were used by UNITE, directly or indirectly, individually or jointly, as part of an effort to knowingly obtain, use and/or disclose personal information from motor vehicle records between July 1, 2002 and August 2, 2004;

4. Spector Gadon & Rosen, P.C. is APPOINTED as class counsel; and

5. Counsel shall be prepared to discuss all issues relating to notice to the class at tomorrow's conference in chambers at 4:00 p.m.