Elizabeth PICHLER; Kathleen Kelly; Russell Christian; Deborah Brown; Seth Nye; Holly Marston; Kevin Quinn; Jose L. Sabastro; Deborah A. Sabastro; Thomas Riley; Amy Riley; Russell Daubert; Carri Daubert,

v.

UNITE (Union of Needletrades, Industrial and Textile Employees, AFL–CIO), a New York Unincorporated Association; Bruce Raynor, a New York Resident; International Brotherhood Teamsters, Does 1–10

National Right to Work Legal Defense Foundation Inc, Intervenor in D.C./Appellant.

No. 08–2354.

United States Court of Appeals, Third Circuit.

Argued: Feb. 2, 2009.

Opinion filed: Nov. 13, 2009.

---

William L. Messenger, Esq., (Argued), William J. Young, Esq., National Right to Work Legal Defense Foundation, Springfield, VA, Attorney for Intervenor in D.C.-Appellant.

Lawrence T. Hoyle, Esq., (Argued), Arlene Fickler, Esq., Hoyle, Fickler, Herschel & Mathes, Philadelphia, PA, Attorneys for UNITE-Appellee.

Before: McKEE and STAPLETON, Circuit Judges and IRENAS,* Senior District Judge.

## OPINION

McKEE, Circuit Judge.

The National Right to Work Legal Defense Foundation ("NRTW") appeals the district court's order denying its motion to modify a protective order that restricts access to certain records. For the reasons that follow, we will affirm.

## I. Factual Background.

In the fall of 2002, the Union of Needletrades, Industrial & Textile Employees AFL-CIO ("UNITE")[1] decided to launch a union organizing campaign targeting CINTAS Corporation, the largest domestic employer in the industrial laundry industry. CINTAS employs approximately 28,-000 people at 350 locations in the United States and Canada. Many of those employees are female, Black, or Hispanic.

UNITE initiated that campaign because it believed that CINTAS was paying low wages, offering poor benefits, and subjecting its employees to unsafe working conditions, discriminatory practices, and violations of various labor laws.[2] "CINTAS ... is philosophically opposed to unions and union organizing." *Pichler v. UNITE*, 542 F.3d 380, 383 (3d Cir.2008). UNITE therefore believed that its organizing efforts would not be successful unless representatives of the union visited employees' homes because employees would not speak freely on the job where they could be observed by management and exposed to coercion and/or retaliation.

In order to contact CINTAS employees in their homes, UNITE compiled lists of names and addresses of presumed CINTAS workers from a variety of sources. The sources included license plate numbers of cars parked in CINTAS parking lots. The license plate numbers were used to obtain names and addresses of the registered owners of the respective cars from databases containing state motor vehicle records, a technique known as "tagging."

---

* The Honorable Joseph Irenas, Senior District Judge of the United States District Court for the District of New Jersey, sitting by designation.

1. In July of 2004, UNITE merged with the Hotel Employees and Restaurant Employees International Union ("HERE") and the combined entity became known as "UNITE HERE." We will refer to the union simply as "UNITE."

2. The International Brotherhood of Teamsters AFL-CIO represented some of UNITE's employees, and UNITE and the Teamsters therefore agreed to work together to organize CINTAS employees. The Teamsters are not involved in this appeal.

Tagging was generally accomplished by UNITE organizers entering or observing a CINTAS parking lot and recording license plate numbers of cars. The license plate numbers were then checked by using either a Westlaw database or private investigators known as "information brokers." The information brokers would—either directly or through intermediaries—obtain the owners' names and addresses through state motor vehicle bureaus. This allowed UNITE to obtain names and addresses of employees who might support unionizing CINTAS, and it also allowed UNITE to identify potential plaintiffs and construct a plaintiff class consisting of approximately 1,800 to 2,000 CINTAS employees. The class action subsequently asserted claims against CINTAS for violating various employment laws.

According to Westlaw's records, UNITE conducted approximately 13,700 motor vehicle searches on Westlaw from August of 2002 to October 13, 2004. However, some of those searches were duplicates and some did not result in the retrieval of any information. Of the total Westlaw searches conducted by UNITE, approximately 1,576 pertained to CINTAS. The remainder of the searches—approximately 12,000 in number—did not pertain to individuals related to UNITE's labor organizing campaign at CINTAS. This appeal centers around Westlaw's recreation of those 12,000 searches.

The named plaintiffs in this case, Elizabeth Pichler, Kathleen F. Kelly, Deborah Brown, Russell Christian, Carri Daubert, Holly Marston, Seth Nye, Kevin Quinn, Amy Riley, Thomas Riley, Deborah A. Sabastro, Jose L. Sabastro and Russell Daubert all have some connection to CINTAS's plant in Emmaus, Pennsylvania.[3] Employees Pichler, Quinn, Thomas Riley and Jose Sabastro began complaining about UNITE's actions and inquiring into how UNITE could have obtained their home addresses.

Employee complaints eventually came to the attention of CINTAS's outside counsel, Jeffrey I. Kohn, of O'Melveny & Myers. Kohn, in turn, contacted Paul R. Rosen, of Spector Gadon & Rosen, P.C., to inquire whether he had any interest in representing employees who were upset about what had happened. In April 2004, employees Pichler, Brown, Kelly, Nye, Russell Daubert, Thomas Riley and Jose Sabastro, met with Kohn and James Bucci of Spector Gadon. Kohn introduced himself and asked the employees to describe their encounters with the union organizers. Soon after the meeting, Bucci contacted nonemployees Christian Marston, Carri Daubert, Amy Riley and Deborah Sabastro by telephone. Ultimately, Spector Gadon was retained to bring a lawsuit against UNITE based on UNITE's tagging operation.

On June 28, 2004, Spector Gadon filed a lawsuit on behalf of the named plaintiffs. A few weeks later, a one-count amended class action complaint was filed, alleging that UNITE and Bruce Raynor, UNITE's president (hereinafter collectively "UNITE"), violated the Driver's Privacy Protection Act of 1994 ("DPPA"), 18 U.S.C. §§ 2721–25. UNITE moved to dismiss the amended complaint under Fed. R.Civ.P. 12(b)(6); however, the district court denied the motion. *Pichler v. UNITE*, 339 F.Supp.2d 665 (E.D.Pa.2004) ("*Pichler I*"). On May 31, 2005, the district court certified a class to proceed against UNITE, though not against Raynor, and dismissed some of the plaintiffs for lack of standing. *Pichler v. UNITE*, 228 F.R.D. 230 (E.D.Pa.2005) ("*Pichler*

---

**3.** The group includes CINTAS employees, as well as spouses and friends of employees, whose cars were driven to work by employees.

*II* "). On August 30, 2006, the district court found that UNITE had violated the DPPA, granted summary judgment against UNITE, awarded the plaintiffs $2,500 each, and granted summary judgment in favor of Raynor. *Pichler v. UNITE*, 446 F.Supp.2d 353 (E.D.Pa.2006) ("*Pichler III* "). Pursuant to Fed.R.Civ.P. 54(b), the district court also certified the case for appellate review, deferring the questions about class-wide and injunctive relief. Finally, on October 17, 2006, the district court amended its previous judgment and granted summary judgment to UNITE on the issue of punitive damages. *Pichler v. UNITE*, 457 F.Supp.2d 524 (E.D.Pa.2006) ("*Pichler IV* "). The district court also permanently enjoined UNITE and its employees from using or disclosing any of the plaintiffs' personal information obtained by UNITE in violation of the DPPA. Both sides appealed.

We affirmed the district court in part, vacated and remanded in part. Although several issues were raised during that appeal, the only issue relevant to our inquiry here is the challenge to UNITE's tagging operation, and the plaintiffs' claim that it violated the DPPA. We affirmed the district court's conclusion that UNITE had violated the DPPA by accessing plaintiffs' motor vehicle records during its tagging operation. *Pichler v. UNITE*, 542 F.3d 380 (3d Cir.2008) ("*Pichler V* ").

### A. The Protective Order.

Shortly after the district court denied UNITE's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), UNITE filed a motion for a protective order[4] which it claimed was necessary to safeguard the privacy of the individuals involved in the *Pichler* class action, prevent disclosure of

UNITE's organizing strategy, and also prevent CINTAS from using the *Pichler* class action as a tactical weapon against UNITE. The district court issued the requested protective order on January 7, 2005. That order allows UNITE to designate "potential evidence as confidential if that potential evidence directly relates to defendants' labor union organizing or mobilization strategies." (J.App.29.) According to UNITE, the protective order has allowed the *Pichler* class action to proceed independently of both UNITE's organizing efforts and the ongoing litigation involving UNITE and CINTAS.

The protective order in the *Pichler* class action pertains to the records that were disclosed in response to the *Pichler* plaintiffs' subpoena *duces tecum* as well as the testimony of a representative of the company which operates Westlaw. Those records included Westlaw's recreation of the searches UNITE conducted between July 1, 2002 and October 13, 2004. UNITE designated those records as confidential pursuant to the protective order, and therefore never filed them with the court. Accordingly, they never became part of the judicial record.

Most importantly for our purposes, the disclosed records that are subject to the protective order include the names of the approximately 12,000 people whose motor vehicle information was accessed by UNITE, but who were not connected to UNITE's union organizing campaign at CINTAS, and who were not putative members of the *Pichler* class action against UNITE (the "Disputed Search Records").

As we mentioned at the outset, this appeal arises from the district court's refusal to modify that protective order to allow

---

4. A " 'Protective Order' properly denotes court orders over information exchanged during discovery." *Pansy v. Borough of Strouds-* *burg*, 23 F.3d 772, 777 n. 1 (3d Cir.1994) (citing Fed.R.Civ.P. 26(c)).

the NRTW access to the Disputed Search Records. The NRTW is a foundation that describes itself as "a non-profit, legal aid organization that provides information and legal assistance to employees who have suffered violations of their rights as a result of compulsory unionism." (Appellant's Br. 7.) The NRTW summarizes its interest in the *Pichler* class action as follows: "[T]he [NRTW] seeks to inform individuals whose motor vehicle records were searched by UNITE, and who are outside the Plaintiff Class, that UNITE accessed their motor vehicle records in potential violation of the DPPA." (Appellant's Br. 8.)

## B. The NRTW's Attempt to Intervene.

On July 30, 2007, the NRTW sent a letter to counsel for the *Pichler* plaintiffs requesting access to the Disputed Search Records for the purpose of contacting the approximately 12,000 individuals whose motor vehicle records were accessed by UNITE, who are not connected to UNITE's union organizing campaign at CINTAS, and who are not putative members of the *Pichler* class. *Pichler* class counsel responded by informing the NRTW that they had no objection to such disclosure if it was consistent with the limitations imposed by the district court's protective order and the DPPA. Class counsel agreed not to object to the NRTW's intervention in the *Pichler* litigation, but stated that they would take no position on the merits of the NRTW's efforts to obtain the records.

Thereafter, on September 19, 2007, while the interlocutory appeal of the district court's grant of summary judgment in *Pichler III* was pending, the NRTW moved to intervene in the *Pichler* class action. The NRTW asked the court to modify the protective order to allow it to access the Disputed Search Records in order to notify each of the approximately 12,000 individuals whose names and addresses are contained in the Disputed Search Records that their privacy rights under the DPPA may have been violated by UNITE.

If allowed access to the records, the NRTW intends to inform those individuals that UNITE may have violated their rights under the DPPA. The NRTW represented to the district court that it would use the Disputed Search Records to mail one letter to each of the 12,000 individuals to inform them that UNITE accessed their motor vehicle records.

The proposed letter states:

The [NRTW] is a non-profit legal-aid organization that provides information and free legal advice and representation to employees who have suffered violations of their rights as a result of compulsory unionism.

\* \* \* \* \* \*

If your [sic] are interested in determining whether UNITE's search of your motor vehicle records violated your rights under the Driver's Privacy Protection Act, you should contact an attorney. If you wish, you can contact the [NRTW] to learn about your rights and options under the Driver's Privacy Protection Act.

(J.App.118–19.)

UNITE sought to prevent the NRTW from accessing the Disputed Search Records. UNITE contended that "NRTW is philosophically opposed to UNITE's organizing activities, and the information NRTW seeks can be used to reverse engineer organizing strategies and combat UNITE's organizing mission." (J.App.9.)

On February 7, 2008, the district court granted the NRTW's motion to intervene, but denied the NRTW's motion to modify the protective order. The district court

explained that "NRTW's only basis for accessing this information is the common law right of access to judicial records; they do not, and we believe cannot, point to any other common law, statutory, or Constitutional right that would create a path of access to the documents they desire...." (J.App.10–11.) The court explained further that "what NRTW seeks has not been filed with the court in any motions or pleadings; instead, it consists of defendants' production to the plaintiffs; such documents are raw discovery and are ordinarily inaccessible to the public through the common law right of access; thus, NRTW has no path of access to this information or a presumptive right to it." [5] (J.App.12.)

On February 19, 2008, the NRTW moved for reconsideration, arguing that it never claimed it had a public right of access to the documents. Rather, the NRTW had relied on the fact that *Pichler* class counsel would provide the documents to it but for the protective order prohibiting disclosure.

On April 15, 2008, the district court denied the NRTW's motion for reconsideration. The district court clarified that in its February 7, 2008 order, it had "held that NRTW did not have standing to seek the documents in question because it had no path of access to the documents, i.e., there is no legal basis for NRTW to get at these documents other than the fact that plain-

tiffs have them." (J.App.3.) In the alternative, the district court held that, even if the NRTW did have standing, modification of the protective order would not be appropriate under the applicable legal standard.

This appeal followed.[6]

## II. The Driver's Privacy Protection Act of 1994.

The DPPA forbids state officials from "knowingly disclos[ing] or otherwise mak[ing] available to any person or entity: personal information ... about any individual obtained by the department [of motor vehicles] in connection with a motor vehicle record," unless certain specified exceptions to the prohibition apply. 18 U.S.C. § 2721(a). The DPPA also prohibits others from knowingly "obtain[ing] or disclos[ing] personal information, from a motor vehicle record" for an unlawful purpose and from "mak[ing] false representation[s] to obtain any personal information from an individual's motor vehicle record." 18 U.S.C. § 2722. Those who "knowingly obtain[ ], disclose[ ] or use[ ] personal information, from a motor vehicle record" are "liable to the individual to whom the information pertains...." 18 U.S.C. § 2724(a). If a defendant is found liable, a court may award:

(1) actual damages, but not less than liquidated damages in the amount of $2,500;

---

5. The right of access to judicial proceedings and judicial records is beyond dispute. *Pansy v. Borough of Stroudsburg,* 23 F.3d 772 (3d Cir.1994) (citations omitted). However, because the documents the NRTW seeks have never been filed with the district court, they are not judicial records, and, therefore, the NRTW cannot obtain access to them under the right of access doctrine. *Id.* at 780–83. The NRTW does not dispute that it cannot obtain the documents under the right of access doctrine.

6. We have jurisdiction under the collateral order doctrine to review the denial of the motion to modify the Protective Order and the denial of the motion to reconsider. *See Shingara v. Skiles,* 420 F.3d 301, 304–05 (3d Cir.2005). Our review is for abuse of discretion, but we exercise plenary review over the district court's interpretation and application of the legal standard for granting or modifying a confidentiality order. *Id.* at 305 (citation omitted).

(2) punitive damages upon proof of willful or reckless disregard of the law; (3) reasonable attorneys' fees and other litigation costs reasonably incurred; and (4) such other preliminary and equitable relief as the court determines to be appropriate.

18 U.S.C. § 2724(b).

However, the DPPA also specifies a total of 14 exceptions to the general prohibition against disclosing motor vehicle records. *See* 18 U.S.C. § 2721(b). In *Pichler III*, the district court rejected UNITE's claim that its tagging operation fit within two of the 14 exceptions in the DPPA, and that it should therefore not be held liable for violating the DPPA's prohibitions. Those two exceptions allow access in connection with litigation (the "litigation exception") or for use by a governmental agency or any private person or entity acting on an agency's behalf (the "agency exception"). Specifically, the litigation exception states that motor vehicle records may be accessed:

> For use in connection with any civil, criminal, administrative, or arbitral proceeding in any Federal, State, or local court or agency or before any self-regulatory body, including the service of process, investigation in anticipation of litigation, and the execution or enforcement of judgments and orders, or pursuant to an order of a Federal, State, or local court.

18 U.S.C. § 2721(b)(4). The agency exception allows records to be accessed "[f]or use by any government agency, including

any court or law enforcement agency, in carrying out its functions, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions." 18 U.S.C. § 2721(b)(1).

As we have just noted, in defending against the *Pichler* class action, UNITE argued that tagging was a permissible use under the litigation and agency exceptions. UNITE contended that the litigation exception applied because it had obtained the plaintiffs' personal information as part of a union organizing effort, activity protected under the National Labor Relations Act. *See* 29 U.S.C. § 157. UNITE also argued that the agency exception applied because it had subsequently filed discrimination charges against CINTAS with the EEOC and was therefore acting as a private attorney general to eradicate employment discrimination at CINTAS. It further contended that the agency exception applied because it either assisted, or itself filed, four OHSA complaints against CINTAS.[7] The district court rejected UNITE's contentions and concluded that UNITE's tagging operation violated the DPPA. *See Pichler III*, 446 F.Supp.2d at 373–74.

## III. Discussion.

Although the litigation involving UNITE, CINTAS, and the *Pichler* class is multifaceted and ongoing, the dispute before us is discrete and straightforward. As we noted at the outset, the NRTW argues that the district court erred in not

---

7. "From 2002 through October 13, 2004, UNITE brought or assisted in bringing against CINTAS, six federal cases, three state court cases, eighteen charges with the Equal Employment Opportunity Commission ('EEOC'), and four charges with the Occupational Safety and Health Administration ('OSHA')." *Pichler III*, 446 F.Supp.2d at 363 (footnotes omitted). "UNITE also filed unfair labor practice charges with various offices of the National Labor Relations Board ('NLRB'), some of which were settled without any admission of liability." *Id.* "In addition ..., UNITE ... filed a charge with the Ohio Civil Rights Commission, and the California Department of Fair Employment and Housing." *Id.*

modifying the protective order to allow it access to the Disputed Search Records.

The district court held that the NRTW lacked standing to request modification of the protective order because the Disputed Search Records are not judicial records, and the NRTW therefore lacked a path of access. The NRTW contends on appeal that it has standing to seek modification of the protective order, not based on the common law right of access to judicial records, but rather because *Pichler* class counsel would provide the Disputed Search Records to NRTW if not for the protective order. In response, UNITE argues that the NRTW lacks standing under this second theory as well. Because we agree that the NRTW lacks standing, that ends our inquiry, we need not consider the district court's alternative holding that modification of the protective order is inappropriate on the merits.[8]

In *Pansy v. Borough of Stroudsburg*, we addressed a third party's standing to challenge protective orders or confidentiality orders[9] in an effort to access information or judicial proceedings. 23 F.3d 772 (3d Cir.1994). We began our standing analysis by explaining:

> Art. III requires the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, and that the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision.

*Id.* at 777 (quoting *Valley Forge Christian Coll. v. Am. United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (citation and internal quotations omitted)).

In *FOCUS v. Allegheny County Court of Common Pleas*, we considered whether a citizen's advocacy group ("FOCUS") had standing "to present ... free speech challenges to the gag orders"[10] that had been entered by a state trial court. 75 F.3d 834, 838 (3d Cir.1996). We noted that:

> The party invoking federal jurisdiction bears the burden of establishing the elements of standing, and each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.

*Id.* (citations and internal quotations omitted).

Questions of standing arose in *FOCUS* because gag orders had constrained the attorneys and parties in other litigation from disclosing information to FOCUS that was pertinent to the group's mission. FOCUS argued that the gag orders entered in the other litigation prevented a willing speaker from disclosing information to it, even though the orders did not "constrain [FOCUS's] speech in any way[,]" and that FOCUS therefore had standing. *Id.* We agreed that the impact of the orders on FOCUS could be sufficient to give FOCUS standing to challenge the protective orders. We explained that " '[w]e

---

**8.** Standing is a jurisdictional requirement under Article III. *See Soc'y Hill Towers Owners' Ass'n v. Rendell,* 210 F.3d 168, 175 (3d Cir. 2000). In *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 93–102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), the Supreme Court held that a federal court may generally not rule on the merits of a case without first determining jurisdictional issues.

**9.** A confidentiality order "denote[s] any court order which in any way restricts access to or disclosure of any form of information or proceeding, including but not limited to 'protective orders,' 'sealing orders' and 'secrecy orders.' " *Pansy,* 23 F.3d at 777 n. 1.

**10.** No party involved in the appeal addressed the issue of FOCUS's standing.

have routinely found, ... that third parties have standing to challenge protective orders and confidentiality orders in an effort to obtain access to information or judicial proceedings.' " *Id.* (quoting *Pansy,* 23 F.3d at 777). However, we also noted:

> [That] putative recipients of speech usually have standing to challenge orders silencing would-be speakers does not necessarily mean that [FOCUS has] standing.... [FOCUS] must still show that the gag orders have caused them injury in fact and that their injury is likely to be redressed by a favorable decision.... Accordingly, courts have found that third parties have standing to challenge a gag order only when there is reason to believe that the individual subject to the gag order is willing to speak and is being restrained from doing so.

*Id.* at 838–39 (citations omitted). Consistent with the last sentence recited above, we wrote:

> Looking at the allegations in the verified complaint in the light most favorable to [FOCUS] here, there are reasons to conclude that [FOCUS] has adequately met a "willingness of the speaker" requirement for standing at this stage of the litigation. As we have noted, while neither party to the [other litigation] is on record as being opposed to the gag orders, the [foster parents involved in the other litigation] at least were willing to talk at some point prior to the entry of the gag orders: The complaint alleges that the [foster parents] "recently released a book detailing their experiences with [a child they were trying to adopt] and their frustration with [Allegheny County Children and Youth Services] and the courts." Moreover, the complaint further alleges that the judge "has threatened to remove [the child] from the [foster parents'] home if [the foster parents] appear to publicly promote

their book or otherwise discuss their case." It is reasonable to infer from these allegations that the [foster parents] are willing but restrained speakers who dare not challenge the gag orders for fear of reprisal from the judge. At this stage, we must accept these allegations and this permissible inference in [FOCUS's] favor.

> In sum, we find that [FOCUS] has alleged facts in [its] verified complaint which would be sufficient to survive a motion to dismiss for lack of standing.

*Id.* at 839.

We also discussed the "willing speaker" doctrine in *United States v. Wecht,* 484 F.3d 194 (3d Cir.2007). The case involved Dr. Cyril Wecht, a well-known forensic pathologist, who had been indicted for theft of honest services, mail fraud, wire fraud, and theft from an organization receiving federal funds. After the indictment, the government and defense counsel agreed to a gag order pursuant to a local rule of the United States District Court for the Western District of Pennsylvania which limited the extent to which attorneys could comment on a case. About two months after the gag order was entered, the government notified the district court about statements that Wecht's attorneys had made to the press.

At some point, two newspapers and two TV stations successfully moved to intervene and then challenged the gag order under the willing speaker doctrine. They argued that since defense counsel wanted to speak about the case, the gag order placed an improper restriction on their access to the attorneys' statements. The media outlets claimed this improper restriction gave rise to their third-party standing to challenge the constitutionality of the local rule allowing such gag orders, and, therefore, they could bring claims for disclosure under the First Amendment on

behalf of the public. *Wecht,* 484 F.3d at 202.

The government contended that the defense attorneys could not be willing speakers because they agreed to the gag order. The government argued that defense counsel's consent to the gag orders precluded the media outlets from establishing third-party standing.

We began our discussion of third party standing by recalling our analysis in *FOCUS*:

> We noted [in FOCUS] that "putative recipients of speech usually have standing to challenge orders silencing would-be speakers," but that "plaintiffs still must show that the gag orders have caused them injury in fact and that their injury is likely to be redressed by a favorable decision." [*Focus,* 75 F.3d] at 838. Accordingly, we held that "third parties have standing to challenge a gag order only when there is reason to believe that the individual subject to the gag order is willing to speak and is being restrained from doing so." [*Focus,* 75 F.3d] at 838–39.

*Wecht,* 484 F.3d at 202. We rejected the government's argument that defense counsel's consent to the gag order negated third party standing because that argument "misconstrue[d] the purpose of the 'willing speaker' rule as well as the requirements for standing." *Id.* We explained:

> The purpose of the "willing speaker" requirement, therefore, is not to tie the third party's interests to those of the speaker, but to ensure that there is an injury in fact that would be redressed by a favorable decision. Here, it is undisputed that Wecht's attorneys are willing to speak about the case and that [the local rule pursuant to which the gag order was entered] limits their ability to do so. To the extent that an occasion

arises in the future where defense counsel desires to make public statements about the case, we believe the media and the public have a legitimate interest in those comments not being inhibited by overly restrictive limitations. Accordingly, we hold that the consent of the parties to the order limiting speech is irrelevant to third-party standing analysis as long as the third party can demonstrate that an individual subject to the order would speak more freely if the order is lifted or modified.... The media outlets have satisfied this requirement and have standing to challenge the constitutionality of the [local rule].

*Id.* at 202–03.

■ Based on these cases, the NRTW contends that it has third party standing to seek modification of the protective order and obtain access to the Disputed Search Records because *Pichler* class counsel would provide the Disputed Search Records absent the protective order. However, the NRTW misinterprets the parameters of the willing speaker doctrine as well as the obstacles to disclosure of the Disputed Search Records.

*Pichler* class counsel cannot accurately be characterized as willing to provide the Disputed Search Records but for the protective order. In response to the NRTW's July 30, 2007 letter requesting disclosure, *Pichler* class counsel wrote:

> We and our clients have no objection to providing you with this information, at your expense, *provided* that we are assured that doing so will not violate any obligations we may have to maintain the confidentiality of that information, whether pursuant to the Court's protective order or under the DPPA. In this regard we would accept your proposal that you intervene in this case to seek an order permitting our disclosure of

this information to you. We would consent to your motion to intervene, but not take a position as to the merits of your effort to obtain the information.

(J.App. 115 (emphasis in original).)

Thus, *Pichler* class counsel are not in the same position as the foster parents in *FOCUS* or defense counsel in *Wecht,* all of whom were willing to speak, but silenced solely by gag orders.[11] The protective order is not the only reason the NRTW is prevented from accessing the Disputed Search Records here, and NRTW's claim to the contrary is just plain wrong. Even absent the protective order, disclosure still cannot be allowed if it would violate the prohibitions and protections Congress established under the DPPA.

The NRTW argues that it can obtain the Disputed Search Records under the DPPA's "litigation exception." As previously noted, that exception allows disclosure of otherwise protected records:

> For use in connection with any civil, criminal, administrative, or arbitral proceeding in any Federal, State, or local court or agency or before any self-regulatory body, including the service of process, investigation in anticipation of litigation, and the execution or enforcement of judgments and orders, or pursuant to an order of a Federal, State, or local court.

18 U.S.C. § 2721(b)(4). The NRTW makes three arguments in support of its contention. First, it claims that the Disputed Search Records will be used "pursuant to an order of a Federal ... court" because it is requesting that a federal court enter an order that permits it to use the Disputed Search Records to send no-

tices to the victims of UNITE's motor vehicle record searches. Second, NRTW contends that its use of the Disputed Search Records will be "in connection with any civil ... proceeding in any Federal ... court" because using evidence of the wrongdoing in *Pichler* to inform similarly situated victims is an action "in connection with" the *Pichler* class action against UNITE. Third, it contends that its use of the Disputed Search Records will be pursuant to an "investigation in anticipation of litigation" because it intends to provide free legal aid to employees who contact it upon learning that UNITE violated their DPPA rights. We are not persuaded by any of these arguments.

When we decided *Pichler V,* we agreed with the district court's conclusion that the litigation exception did not extend to UNITE's tagging operation. In rejecting UNITE's contrary position there, the district court explained:

> [T]he exception applies only if a defendant obtains protected information for a permitted "use." As we construe the term, *"use" implies a reasonable likelihood that the decision maker would find the information useful in the course of the proceeding.*

*Pichler I,* 339 F.Supp.2d at 668 (emphasis added). We agreed with the district court that the litigation exception of the DPPA requires something more than merely using the protected records to identify potential litigants. The two examples that the district court used in explaining the limitation of the exceptions UNITE relied upon illustrate the point:

> [I]f the Unions claimed before the [National Labor Relations] Board that

---

11. In addition, the challenges in *FOCUS* and *Wecht* were premised on violations of First Amendment rights. FOCUS alleged that the gag order violated its First Amendment rights, and the media outlets in *Wecht* asserted First

Amendment claims on behalf of the public. Obviously, the NRTW cannot make a First Amendment challenge to the protective order here.

Cintas somehow rigged a certification election so that the results did not accurately reflect the number of employees who wanted union representation, they would need to identify which employees actually desired such representation. Obtaining personal information about employees to contact them regarding how they voted would be a permissible "use" because it is reasonably likely that the Board would need to know which employees supported unionization. On the other hand, the litigation exception would not apply if the Unions argued before the NLRB that Cintas engaged in an unfair labor practice by hiring security guards to keep them from recording employee license plate numbers because it is not reasonably likely that the Board would require any information about which employees parked in a particular lot to resolve the issue.

*Id.*

Just as the litigation exception protected the records of CINTAS employees who might have been interested in pursuing legal or administrative remedies against their employer from UNITE's tagging operation, it also protects the 12,000 persons whose records comprise the Disputed Search Records from the NRTW's efforts to identify persons who might be interested in pursuing legal remedies against UNITE.

The records the NRTW is seeking will not advance the inquiry of any decisionmaker charged with deciding any claims under the DPPA that may arise from disclosure to the NRTW. The information the NRTW wants to obtain would do nothing more than identify potential litigants and claimants who may wish to pursue remedies for UNITE's violation of the DPPA. That is not enough to compromise the privacy afforded motorists by the DPPA. In fact,

> The least sympathetic case for discovery sharing is presented by a request for access on behalf of someone who is merely contemplating the commencement of litigation. The risk of a fishing expedition or some other form of mischief is greatest in this context. The safest course seems to be denial of discovery sharing until the requesting party actually has begun a lawsuit, unless he demonstrates extraordinary need.

Arthur R. Miller, *Confidentiality, Protective Orders, and Public Access to the Courts,* 105 Harv. L.Rev. 427, 499 (1991).

UNITE's use of the information obtained through tagging was impermissible because it amounted to nothing more than discovery of potential plaintiffs. We see no distinction between UNITE's impermissible purpose, and the purpose for which the NRTW is seeking the information.

We realize that the district court's analysis in *Pichler I* turned in part upon the "tenuous connection between the protected information and issues tangentially related to a conceivable litigation strategy," *Pichler I,* 339 F.Supp.2d at 668, and that it is far more likely that litigation could result from disclosure here because there is little doubt that each of the persons whose records were accessed has a cause of action under the DPPA. However, that is not determinative. Rather, as the district court explained, the applicable exceptions to the protections of the DPPA turn on whether there is a "reasonable likelihood" that the disputed records would assist the fact finder's resolution of the dispute before it.

■ As the district court explained in *Pichler III,* "[t]he DPPA . . . does not permit one to acquire and use statutorily proscribed personal information to solicit or find claims." 446 F.Supp.2d at 370.

The district court believed that "UNITE's actions amounted to ... trolling [that was] far short of the concreteness Congress had in mind to remove the DPPA's protection." *Id.* The NRTW's trolling is almost certain to result in a much richer catch than UNITE's because the waters the NRTW is trolling have been stocked with 12,000 potential plaintiffs. The waters UNITE was trolling had far fewer fish, and there was no certainty of finding any claimants or plaintiffs at all. However, that quantitative distinction does not result in a qualitative difference.

In *Pichler v. UNITE* argued that Congress could not have intended to punish tagging under the DPPA because Congress had enacted legislation to protect labor organizing. Thus, according to UNITE, Congress could not have intended to prohibit a disclosure that advances labor rights conferred by Congress. We rejected that argument. We now reject the NRTW's attempt to argue that since Congress created a cause of action for the improper disclosure of motor vehicle records, it could not have intended to prohibit disclosure to advance that cause of action. None of the Disputed Search Records could advance the adjudication of pending or future litigation. The NRTW is not seeking to obtain information for use in the *Pichler* class action; on the contrary, as UNITE notes, the NRTW is seeking information about people who are not even members of the *Pichler* class.

Since the proposed use for which the NRTW seeks the Disputed Search Records is not permissible under the DPPA, Pichler class counsel cannot be deemed a "willing speaker." Accordingly, the court action cannot redress the NRTW's asserted injury. The NRTW therefore lacks standing to challenge the protective order.

## III. Conclusion.

For the above reasons, we will affirm the district court's order denying the NRTW's motion to modify the protective order and its order denying the NRTW's motion for reconsideration.